MARCUS BATTEAST, a Minor, by his Parents and Next Friends, James Batteast *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. WYETH LABORATORIES, INC., *et al.*, Defendants-Appellants and Cross-Appellees.

First District (3rd Division) No. 84—2818

Opinion filed June 22, 1988.—Rehearing denied July 22, 1988.

116

Sidley & Austin and Crooks & Gilligan, both of Chicago (Robert A. Downing, Sara J. Gourley, Eugene A. Schoon, Kendal A. Crooks, John W. Gilligan, and John P. Prusik, of counsel), for appellants.

Holstein, Mack & Associates and William Harte, Ltd., both of Chicago

(William J. Harte, Robert A. Holstein, John M. Mack, and John B. Austin, of counsel), for appellees.

JUSTICE RIZZI delivered the opinion of the court:

This is a personal injury action by plaintiffs, James and Shirley Batteast, individually and on behalf of their minor son, Marcus Batteast (Marcus), against defendants Wyeth Laboratories, Inc. (Wyeth), St. Bernard Hospital (Hospital), Dr. Edgar Dela Cruz (Dela Cruz), and Dr. Jose Abella (Abella). The action against the Hospital, Dela Cruz and Abella was based on theories of negligence and willful and wanton conduct. The action against Wyeth was based on strict liability, negligence and willful and wanton conduct: Prior to trial, plaintiffs entered into a settlement agreement with Dela Cruz and Abella. Plaintiffs also entered into a settlement agreement with the Hospital while the jury was deliberating.

In the action on behalf of Marcus, the jury returned a verdict in favor of plaintiffs and against Wyeth and the Hospital for compensatory damages in the amount of $9,200,000 (later reduced by $910,000, which is the total amount of the settlements with the Hospital, Dela Cruz and Abella); the jury also returned a verdict in favor of plaintiffs and against Wyeth for punitive damages in the amount of $13,000,000. In the action by James and Shirley Batteast, individually, the jury returned a verdict in favor of plaintiffs and against Wyeth and the Hospital in the amount of $85,000 for medical expenses incurred on behalf of Marcus. In addition to the general verdicts, the jury answered "No" to the following special interrogatory submitted by Wyeth: "Was the conduct of St. Bernard Hospital, immediately before and at the time of the occurrence complained of, the sole proximate cause of the plaintiff's injury."

After trial, Wyeth filed a motion to vacate the judgments that had been entered on the verdicts and to dismiss the complaint. Wyeth argued that the agreement entered into between plaintiffs and Abella during trial was a release and that Wyeth was therefore discharged from any liability. Wyeth's motion was denied.

Wyeth appeals from the judgments that were entered on the jury's verdicts and from the denial of its motion relating to the release that was given to Abella. Shirley and James Batteast cross-appeal from the dismissal of a count in their second consolidated complaint based on a claim of parental loss of society and companionship arising from Marcus' injuries. We affirm the judgments and orders from which the appeal and cross-appeal are taken by the respective parties.

On January 22, 1976, two-year-old Marcus Batteast was admitted to he Hospital for treatment of an upper respiratory infection and febrile convulsions. Upon admittance, Marcus' care was assigned to Dela Cruz. Marcus remained in the Hospital until January 28, 1976. On February 5, Marcus was again admitted to the Hospital. At this point, Marcus was suffering from dehydration, diarrhea and vomiting, with a temperature of 102.8°. The preliminary diagnosis was acute gastroenteritis and pneumonia. Dela Cruz, Marcus' attending physician, prescribed antibiotics and ordered Marcus placed in an oxygen tent because he was wheezing. Marcus was also placed on intravenous fluids for dehydration.

On February 6, Dela Cruz prescribed oral Marax, a liquid prescription drug. Marax is used to treat bronchial asthma, chronic bronchitis and other respiratory ailments. On the evening of February 7, a Hospital staff member telephoned Dela Cruz and advised him that Marcus' intravenous had come out, that the nurses were unable to restart it, and that Marcus was vomiting. Dela Cruz directed the staff to "hold" the intravenous, and ordered Marax, which causes stomach irritation, discontinued. However, Marax was not discontinued.

On February 8, Dela Cruz ordered Marcus placed on a soft diet and, believing Marax had been discontinued, prescribed one-half of an aminophylline pediatric suppository every eight hours. Like Marax, aminophylline is used to treat bronchial asthma, chronic bronchitis and other respiratory ailments. It is used to achieve the same therapeutic effect as Marax, but without stomach irritation.

At the time Marcus was hospitalized, aminophylline suppositories were manufactured and sold by Wyeth in three sizes: (1) 125 milligrams (mg.), pediatric suppositories; (2) 250 mg., adult suppositories and (3) 500 mg., adult suppositories. Wyeth's package insert states that "when cut in half," a pediatric suppository "is suitable for a child weighing 20 pounds when administered at no less than 8-hour intervals." Marcus weighed 22 pounds on February 5, 1976.

Aminophylline's active ingredient, theophylline, is also an ingredient in Marax. However, Marax contains ephedrine, an ingredient which may react synergistically with aminophylline. The evidence suggests that ephedrine increases the toxicity of aminophylline but does not increase its therapeutic effects.

On February 8, although Dela Cruz prescribed one-half of an aminophylline pediatric suppository (i.e., 62.5 mg.) every eight hours, Marcus was also administered 125 mg. of aminophylline at 2 p.m. and at 8 p.m. Marcus was also administered Marax at 6 a.m., 12

p.m. and 6 p.m. on February 8. On February 9, Marcus was administered 125 mg. of aminophylline at 4 a.m., 2 p.m. and 8 p.m.; Marax was administered at 12 a.m., 6 a.m., 12 p.m. and 6 p.m. On February 10, Marcus was administered 125 mg. of aminophylline at 4 a.m., and Marax at 12 a.m. and 6 a.m. At 7:37 a.m. on February 10, a nurse observed that Marcus had vomited, both eyes were "stiff," and he was "twitching and grunting." At 7:45 a.m. an emergency code "Blue" was called. At 9 a.m., Marcus had a seizure and three hours later, Marcus was transferred to Children's Memorial Hospital for treatment and care.

Plaintiffs' position is that Wyeth manufactured and distributed aminophylline in a defective condition, unreasonably dangerous to children, because it (1) failed to warn the medical profession of the product's dangerous propensities to children, and (2) failed to supply sufficient information for methods of avoiding toxicity and overdose therapy. Plaintiffs also posit that the defective condition of aminophylline was a proximate cause of Marcus' injuries and that Wyeth took a course of action which shows an utter indifference to, or conscious disregard for, the safety of others.

At trial, plaintiffs introduced evidence that excessive amounts of aminophylline cause constriction of blood vessels in the brain which decrease cerebral blood flow. Plaintiffs' evidence also indicated that Marcus suffered permanent brain damage as a result of the aminophylline that he had received while a patient at the Hospital. The severity of Marcus' injuries is not contested by Wyeth. Wyeth, however, argues that there is no evidence that Wyeth proximately caused Marcus' injuries and, therefore, judgment *n.o.v.* is mandated.

Wyeth introduced its aminophylline suppositories into the stream of commerce in 1945. During the 33-year span, from 1950 to 1983, Wyeth made no substantive additions or changes in its package insert. However, from the 1950's to the time that Marcus was a patient in the Hospital, a number of medical reports disclosed a span of information relating to the drug's dangers, methods of protection against overdose and steps to be taken if a patient's theophylline (aminophylline is a form of theophylline) blood level rises out of the relatively narrow therapeutic blood-level range into toxicity. Much of this information is embodied in the form of guidelines that the Federal Food and Drug Administration (FDA) sent to Wyeth on May 7, 1975, with the following instruction: "revise the package insert to conform to the enclosed labeling guidelines."

The 1975 FDA guidelines provide: "Warnings: *** Many children are sensitive to aminophylline. Severe intoxications and deaths have

followed rectal administration because of hypersensitivity or overdosage." Wyeth's expert, Dr. Walson, testified that studies appeared from the 1950's to the present showing theophylline-induced brain damage, deafness, blindness and death. Also, a number of articles in the 1950's discussed reports of theophylline deaths in children. However, unlike the 1975 FDA guidelines, Wyeth's package insert contains no "Warnings" section. Instead, Wyeth's package insert states: "Precautions: *** Overdosage in infants and small children has resulted in such toxic effects as vomiting, restlessness and convulsions." Convulsions, the most serious harm mentioned in Wyeth's package insert, rarely lead to coma or death.

The 1975 FDA guidelines also provide: "Adverse Reactions: *** Cardiovascular: *** circulatory failure. Respiratory: *** respiratory arrest." Unlike the 1975 FDA guidelines, Wyeth's package insert contains no "Adverse Reactions" section. Instead, Wyeth's package insert states under its "Precautions" section, that aminophylline "causes a marked increase in cerebral-vascular resistance with an accompanying decrease in cerebral blood flow." At trial, a pediatric neurologist testified that because there can be cerebral vascular resistance without consequence, since the brain's blood supply normally expands and contracts, Wyeth's "increase in cerebral-vascular resistance with an accompanying decrease in cerebral blood flow" wording does not necessarily alert the physician to the danger of anoxia, or severe decrease in blood supply resulting in brain damage.

Additionally, the 1975 FDA guidelines identify special problems encountered when aminophylline suppository treatment is utilized for children. These problems specifically include erratic absorption and metabolism and the danger of toxic accumulation. These dangers were not disclosed in Wyeth's package insert at the time of Marcus' hospitalization. Yet, the 1975 FDA guidelines provide:

"Actions: *** Absorption from *** rectal administration may be incomplete, sometimes slow and/or variable. Children in contrast with adults absorb the drug quite well by rectum.
* * *
Warnings: *** Rectal absorption of aminophylline is unreliable and the possible cumulative effect of prolonged treatment by this route of administration must be kept in mind.
* * *
Dosage And Administration: *** There is great variation from patient to patient in dosage needed in order to achieve a therapeutic blood level ***. Because of this wide variation from patient to patient and the relatively narrow therapeutic blood

level range, dosage must be individualized with monitoring of theophylline blood levels, particularly when prolonged or repeated use is planned."

However, unlike the 1975 FDA guidelines, Wyeth's insert contains no information which would alert a physician or health care provider that although children absorb the drug quite well by rectum, rectal "absorption of aminophylline is unreliable and the possible cumulative effect of prolonged treatment by this route of administration must be kept in mind." Therefore, there must be "monitoring of theophylline blood levels, particularly when prolonged or repeated use [of aminophylline] is planned." Moreover, the record clearly establishes that Wyeth was aware of background information supporting the necessity of alerting physicians of the effects of aminophylline that are stated in the 1975 FDA guidelines.

The information that is contained in the 1975 FDA guidelines, but is missing in Wyeth's package insert, must be juxtaposed to Dela Cruz' testimony. Dela Cruz testified that he was never informed that Wyeth's drug absorbed faster in a child, or that it had erratic variance from patient to patient, or that he might have to use vastly different dosages to achieve a therapeutic range in different patients. Dela Cruz further testified that if that information had been supplied by Wyeth it would have enabled him "to treat Marcus Batteast with an individual dosage monitored by blood level to make sure you stay within his therapeutic range." According to Dela Cruz, if he had been supplied this information, he would have used blood-level studies. As a result, Dela Cruz would have been required to "pay close attention to the actual medication record in the hospital sheet of Marcus Batteast." Dela Cruz specifically stated: "If the advice and demand to use blood level studies drove me to that medication record, I would have seen what was gotten, and I would have cut that and stopped it."

Moreover, the 1975 FDA guidelines also warn of the toxic synergism effect of combining aminophylline suppositories with ephedrine and other xanthine preparations or drugs. The 1975 FDA guidelines provide:

"Contraindications: *** Aminophylline should not be administered concurrently with other xanthine preparations.

Drug Interactions: Toxic synergism with ephedrine and other sympathomimetic bronchodilator drugs may occur. Recent controlled studies suggest that the addition of ephedrine to adequate dosage regimens of aminophylline produces no increase in effectiveness over that of aminophylline alone, but

does produce an increase in toxic effects."

Unlike the 1975 FDA guidelines, the Wyeth package insert contains no "Drug Interactions" section, no mention of toxic synergism and no instruction to avoid administration of aminophylline concurrently with other xanthine drugs.

Aminophylline is a member of the xanthine family which is a compound of theophylline and ethylenediamine. The active ingredient of aminophylline is theophylline. Marax contains theophylline and ephedrine. Aminophylline and Marax are xanthine preparations. A reading of the 1975 FDA guidelines indicates that the two drugs "should not be administered concurrently." Additionally, an examination of the 1975 FDA guidelines specifies that the addition of ephedrine to adequate dosage regimens of aminophylline produces a toxic synergism. Toxic synergism occurs when the cooperative action of separate drugs is such that the total toxic effect when the drugs are taken together is greater than the sum of the toxic effect when the separate drugs are taken independently. (See Webster's Third New International Dictionary 2320 (1981).) The toxicity of ephedrine is nearly tripled by the concomitant action of moderate doses of aminophylline. Conversely, the toxicity of aminophylline is nearly doubled by the concomitant action of moderate doses of ephedrine. Thus, as reflected in the record, mixtures of these drugs are "markedly synergistic."

The vice-president of medical affairs for Wyeth testified that from 1960 to 1976, he was aware of the toxic synergism of aminophylline and ephedrine. However, one of Wyeth's expert witnesses testified that in 1976 most of the medical community, including physicians in the area where the Hospital is located, were "totally unaware of that synergistic effect." He also testified that "I would guess" that "[c]ertainly" Dela Cruz was unaware of that synergism. Dela Cruz testified that although he knew that Marax contained ephedrine, he did not know about the toxic synergism of combining aminophylline and ephedrine. However, Cruz stated that he did not know that aminophylline should not be given concurrently with other xanthine preparations. Dela Cruz also testified that had he known of the toxic synergism potential, he either would not have prescribed aminophylline suppositories for Marcus or he would have used blood-level studies and paid close attention to the actual medication record in Marcus' hospital sheet.

The 1975 FDA guidelines also warn of adverse reactions and overdose symptoms relating to aminophylline. The 1975 FDA guidelines state:

"Adverse Reactions: The most consistent adverse reactions are: (1) Gastrointestinal irritation: nausea, vomiting and epigastric pain generally preceded by headache, hematemesis, diarrhea; (2) Central nervous system stimulation: irritability, restlessness, insomnia, reflex hyperexcitability, muscle twitching, clonic and tonic generalized convulsions, agitation; (3) Cardiovascular: *** marked hypertension, and circulatory failure; (4) Respiratory: tachypnea [fast breathing], respiratory arrest; *** (6) Others: fever, dehydration."

The 1975 FDA guidelines also state: "Overdosage: Symptoms. In infants and small children: agitation, headache, hyper-reflexia, fasiculations, and clonic and tonic convulsions." Wyeth's package insert contains no "Adverse Reactions" section, nor does it contain an "Overdosage" section. Instead, Wyeth's package insert has a "Precautions" section, which states:

"Overdosage in infants and small children has resulted in such toxic effects as vomiting, restlessness, and convulsions. Headache, nervousness and vomiting, abdominal cramps and diarrhea are common symptoms of sensitivity to aminophylline, especially if given intravenously in full therapeutic doses. Like other xanthines, aminophylline stimulates the cerebral cortex and may precipitate convulsions in susceptible individuals."

Although Wyeth's package insert names convulsions as one of the effects of aminophylline overdosage, it fails to specify "clonic and tonic generalized convulsions," as do the 1975 FDA guidelines. The difference is important because the evidence establishes that the symptoms of aminophylline toxicity are often mistaken for the very symptoms that the doctor is treating. As a result, indications of aminophylline poisoning are often masked by the patient's other symptoms. Here, a doctor from Children's Memorial Hospital testified that there are different kinds of convulsions, including febrile convulsions. Marcus had suffered a febrile convulsion before his first admission to the Hospital, and he had a history of fever during his second hospitalization. Dela Cruz testified that tonic and clonic convulsions are different from other kinds of convulsions and that Marcus' sudden voluntary movements of both upper and lower extremities were characteristic of tonic and clonic convulsions. Dela Cruz also testified that if he had been told by Wyeth that this was a symptom of aminophylline toxicity, it would have been a medical "tip off" to him that maybe the aminophylline suppositories were involved.

The 1975 FDA guidelines also contain a "Dosage And Administration" section, which provides as the maximum children's dosage

within a 24-hour period, 12 milligrams of aminophylline per kilogram of a child's body weight, with a dose every six hours. However, the "Dosage And Administration" section also states that therapeutic blood levels are considered to be between 10 and 20 micrograms of aminophylline per milliliter of blood, and that blood levels above 20 micrograms of aminophylline per milliliter of blood may produce toxic effects. In addition, the "Dosage And Administration" section indicates that there is great variation from patient to patient in dosage needed in order to achieve a therapeutic blood level. The section then concludes:

"Because of this wide variation from patient to patient and the relatively narrow therapeutic blood level range, dosage must be individualized with monitoring of theophylline blood levels, particularly when prolonged or repeated use is planned."

In contrast to the 1975 FDA guidelines, the pertinent part of Wyeth's package insert merely states:

"Dosage:

* * *

Children: A suggested dose that appears effective and safe is 7 mg./kg. as a rectal suppository. The 0.125 gram suppository is suitable for a child weighing approximately 40 pounds; when cut in half it is suitable for a child weighing 20 pounds, when administered at no less than 8-hour intervals."

Wyeth's package insert does not indicate that there is great variation from patient to patient in dosage needed in order to achieve a therapeutic blood level. Nor does the insert inform a health care provider that because of this wide variation from patient to patient, and the relatively narrow therapeutic blood-level range, dosage must be individualized with monitoring of theophylline blood levels. This is particularly so when prolonged or repeated use is planned.

In addition, the dosage recommendation in Wyeth's package inset for children indicates that a 0.125 gram suppository may be cut in half and 0.625 grams of aminophylline administered three times a day to a child weighing 20 pounds. As a result, a child would receive 187.5 mgs. of aminophylline in a 24-hour period. The 1975 FDA guidelines, however, recommend that a child weighing 20 pounds should receive only 120 mgs. of aminophylline in a 24-hour period. Moreover, the FDA guidelines are silent with respect to cutting any dosage of an aminophylline suppository in half. In fact, there is evidence that Wyeth had knowledge of pre-1976 warnings of possible uneven distribution of the aminophylline in the suppositories and of

the consequent unreliability of cutting a suppository in half. A doctor from Children's Memorial Hospital testified that there could be zero mgs. in one-half a 250 mg. suppository and all 250 mgs. in the other half. Dr. Shaw, who was responsible for Wyeth's package insert prior to Marcus' hospitalization, testified that to the best of his knowledge Wyeth never tested the distribution of its drug by cutting the suppositories in half. The two nurses who administered Wyeth suppositories to Marcus on February 8 and 9 were not aware of the problem of uneven distribution created by cutting the suppositories in half.

Moreover, the evidence established the unpredictability of absorption and danger of accumulation of rectally administered aminophylline, and problems of masking, even in the administration of prescribed amounts of aminophylline. Prior to 1974, it was evident in relevant literature that blood levels should be monitored in order to individualize doses. Furthermore, in 1975 there was literature that advised close blood monitoring to prevent the disastrous effects of masking.

As to plaintiffs' claim that Wyeth failed to supply sufficient information for methods of avoiding toxicity and overdose therapy, a comparison of the provisions of the 1975 FDA guidelines and the contents of Wyeth's package insert is appropriate. The 1975 FDA guidelines provide:

> "Therapy: Discontinue drug immediately. No specific treatment. *** Enemas for rectally administered overdosage. Avoid sympathomimetics. Supporting treatment for hypertension, seizure, arrhythmias and dehydration. Sedatives such as short-acting barbiturates will help control central nervous system stimulation. Restore the acid-base balance with lactate or bicarbonate. Oxygen and antibiotics provide supportive treatment."

Wyeth's package insert has no therapy section. Nor does Wyeth's insert contain information concerning treatment of an aminophylline suppository overdose.

The lack of information in Wyeth's package insert is pertinent because, except for the fact that Marcus was intubated and connected with an intravenous when an emergency code "Blue" was called, there was a lapse of about 1 hour and 15 minutes before Marcus received any other therapeutic measures mentioned in the 1975 FDA guidelines. The intubation and intravenous fulfilled Marcus' need for the oxygen and supporting treatment for dehydration recommended in the 1975 FDA guidelines. However, Marcus never received an enema that morning, although the 1975 FDA guidelines

provide for enemas for rectally administered overdosage. Wyeth's package insert does not provide for enemas for rectally administered overdosage.

In 1967, as a result of a report of "confusion" in the medical profession, which was caused by Wyeth's simultaneous marketing of its 125 mg. "Pediatric" and its 250 mg. "Children's" rectal suppositories, Wyeth removed the words "For Children" from its 250 mg. suppository literature. However, Wyeth never took any affirmative measures to alert the medical community about the change. Affirmative measures could have been taken in the form of "Dear Dr." letters, instructions to detail men to convey the information, or in notices or warnings in medical journals or publications.

Wyeth first argues that "[s]ince there is no evidence that Wyeth proximately caused or contributed to plaintiff's injuries, judgment N.O.V. is mandated." It is Wyeth's contention that even if its product was manufactured in a defective condition, such condition could not have been a proximate cause of Marcus' injuries. Wyeth specifically argues that the Hospital's actions constitute the sole proximate cause of Marcus' injuries as a matter of law. We disagree.

■■ ■ A drug may be deemed unreasonably dangerous because of the absence of an adequate warning or sufficient information accompanying the product, as the product may be "unavoidably unsafe" without such warning or information. (See Restatement (Second) of Torts §402A, comment *k* (1965); *Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 550-51, 356 N.E.2d 779, 783.) The determination as to the adequacy of warnings that are included in a package insert of a drug distributed to the medical profession is a question that is within the province of the trier of fact. Here, we believe that there is ample evidence to support plaintiffs' contention that Wyeth's aminophylline was unreasonably dangerous due to the lack of adequate warnings accompanying the product. While the evidence demonstrates that Wyeth was aware of certain risks involved in administering aminophylline suppositories to children, Wyeth failed to warn the medical profession of the risks. Specifically, Wyeth failed to warn of the following risks relating to its product:

> (1) severe intoxication and death have followed rectal administration because of hypersensitivity or overdosage; (2) adverse reactions include circulatory failure and respiratory arrest; (3) absorption from rectal administration is unreliable and there is great variation from patient to patient in dosage needed in order to achieve a therapeutic blood level; (4) when prolonged or repeated use is planned, blood levels must be monitored to es-

tablish and maintain an individualized dosage; (5) toxic synergism may result when aminophylline is combined with other sympathomimetic bronchodilator drugs; (6) tonic and clonic convulsions are an adverse reaction to the use of aminophylline treatment; (7) indications of aminophylline poisoning are often masked by the patient's other symptoms; (8) no formal recommendation had ever been made concerning the advisability of cutting any dosage of an aminophylline suppository in half; and (9) enemas should be utilized for rectally administered overdosage.

Initially, we observe that full and complete disclosure concerning the potential adverse reactions of a drug is necessary to enable a health care provider to render an informed decision regarding utilization of the drug. Here, we believe that the lack of knowledge of the aforementioned warnings seriously impaired Dela Cruz' ability to (1) properly formulate a risk benefit analysis for the drug aminophylline, (2) determine whether aminophylline should be utilized, and (3) institute appropriate measures to insure that the drug is used effectively and safely. As a result, we conclude that the warnings contained in the package insert distributed with Wyeth's aminophylline suppositories were clearly inadequate for the medical profession as a whole, and more importantly, for Dela Cruz as Marcus' health care provider.

■ Since we have concluded that Wyeth manufactured and distributed its aminophylline suppositories in a defective condition, unreasonably dangerous to children, we next address the issue of proximate cause. Although a drug may be unreasonably dangerous, the drug's defective condition must be a proximate cause of the injury before a plaintiff can recover. The existence of proximate cause is a question for the trier of fact to decide. (*Chambers v. Rush-Presbyterian-St. Luke's Medical Center* (1987), 155 Ill. App. 3d 458, 465, 508 N.E.2d 426, 430-31.) A proximate cause of an injury is any cause which, in natural or probable sequence, produced the injury. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury. *United States Fidelity & Guaranty Co. v. State Farm Mutual Automobile Insurance Co.* (1987), 152 Ill. App. 3d 46, 48, 504 N.E.2d 123, 125.

■ In the present case, Dela Cruz testified that he would not have ordered Wyeth's aminophylline suppositories for Marcus if he had been made aware of the risk of death to children from hypersensitivity to the drug. Dela Cruz further stated that he would not have ordered Wyeth's drug for Marcus if he had known of the potential

dangers listed in the "Adverse Reactions" section of the 1975 FDA guidelines. Also, Dela Cruz indicated that when he was treating Marcus, he was not aware of the patient-to-patient variation in absorption of aminophylline. Dela Cruz testified that had Wyeth alerted him of this fact, and of the difference in dosages necessary to achieve therapeutic range, he would have been able to treat Marcus with individual dosages monitored by blood studies. Furthermore, there is evidence that an awareness of the erratic behavior of the drug would have caused Dela Cruz to use blood studies as well as to pay close attention to Marcus' medication record in an effort to individualize Marcus' treatment.

In addition, the evidence demonstrates that had appropriate warnings been provided by Wyeth, aminophylline suppositories would not have been prescribed for Marcus. Also, even given the fact that aminophylline was prescribed, had the appropriate warnings been provided, Marcus' injuries may have been prevented by appropriate medical observation, specifically blood-level studies. The fact that other causes may have contributed to Marcus' injury does not absolve Wyeth of its responsibility to market a drug in a safe condition through the utilization of adequate warnings. We believe that there is a reasonable inference that had adequate warnings been provided to Dela Cruz, Marcus' injuries would have been prevented.

Moreover, extensive evidence was presented concerning confusion among health care providers regarding the utilization of Wyeth's 250 mg. aminophylline suppository in children. Wyeth's own employee, Dr. Stalker, writing to Dr. Lewis in August 1963, referred to the 250 mg. suppository as a "pediatric dosage." Also, as late as May 1983, a Wyeth employee, formerly of the FDA, referred to the 250 mg. suppository as a "pediatric size." Nurse Rakdham, who on February 8, 1976, transcribed Dela Cruz' order, "aminophylline pediatric suppository one half [every] eight hours," from the order book onto the medication card and the cardex, testified that at the time she did not know what Dela Cruz meant by "pediatric suppository." Rakdham simply transcribed what Dela Cruz had written. Rakdham stated that in February 1976, she did not know that a pediatric suppository was 125 mg.

Nurse Webb, who was the nurse administering medication on the 7 a.m. to 3 p.m. shift on February 9, and gave Marcus his second aminophylline suppository that day, had been in St. Bernard's pediatric department as a registered nurse since 1974. Webb testified that at the time of Marcus' injuries, she knew that pediatric suppositories were 125 mg. However, Webb further testified that at the Hospital

"we were told that 250 mgs. were child sized suppositories and the 500 mgs. was adult." Plainly, the jury could have reasonably concluded that the confusion that existed at the time was caused by Wyeth and that the confusion was a significant reason that no questions were asked as to why Marcus was receiving one-half of a 250 mg. suppository rather than one-half of a 125-mg. size.

Given the conflicting expert opinions, testimony and evidence presented at trial, we believe that reasonable persons could reach different conclusions concerning the cause of Marcus' injuries. The issue of causation was therefore properly submitted to the jury. Accordingly, the trial court appropriately denied Wyeth's motion for judgment notwithstanding the verdict.

Wyeth next argues that the trial court erred when it allowed plaintiffs to introduce evidence regarding FDA approval of Wyeth's aminophylline suppositories. At trial, over objection of Wyeth, plaintiffs introduced evidence concerning the issue of whether Wyeth's aminophylline suppositories had ever been approved for distribution as a prescription drug by the FDA. It was plaintiffs' contention that because Wyeth's aminophylline suppositories never received FDA approval, the drug was marketed illegally and should not have been available to Dela Cruz for treatment of Marcus. Wyeth, however, maintains that such evidence was neither admissible nor relevant to plaintiff's case and that the receipt of such evidence constituted prejudicial error.

At this point, a chronology of the administrative actions engaged in by the FDA is essential to an understanding of the parties' positions in this case. In 1938, the Federal Food, Drug and Cosmetic Act (Act) was enacted by Congress. (21 U.S.C. §301 (1982).) The Act provided that new drugs introduced after 1938 be subject to regulatory clearance prior to being sold in interstate commerce. The Act further required that regulatory clearance could be administratively suspended if later required for the public's safety. The Act defined a new drug as any drug which was not previously recognized as safe by experts. Since 1938, the FDA followed an interim policy which allowed drug manufacturers to market what were known as "me-too" drugs without requiring (1) the drug manufacturer to submit a full new drug application and (2) await FDA approval. Me-too drugs are drugs which are chemically equivalent to a drug with an FDA-approved new drug application.

In 1962, the Act was amended. These amendments expanded the definition of a new drug to include a requirement that proof of effectiveness, as well as safety, be submitted as part of all new drug ap-

plications. A further effect of the 1962 amendments was to change the premarketing clearance procedure used for prescription drugs. Under the 1938 Act as originally adopted, new drug applications were deemed approved unless the Secretary initiated certain affirmative steps to reject the application within a fixed period of time. Pursuant to the amendments, the FDA was required to affirmatively express its approval of a new drug application before a drug manufacturer would be permitted to market the drug in interstate commerce.

On January 24, 1968, the FDA announced that it would apply the applicable effectiveness findings from the National Academy of Sciences-Natural Research Council studies to all me-too drugs, identical, related, or similar drug products. Thereafter, on May 18, 1968, the FDA published an announcement which effectively revoked the FDA's previous position that me-too drugs were not new drugs. (33 Fed. Reg. 7758 (1968).) While a proposed procedure was suggested calling for rules to determine which drugs required full (NDA) or abbreviated (ANDA) new drug applications,[1] the proposal was never published in final form as a regulation. "Thus, in 1968, virtually all human prescription drugs were regarded as new drugs." (*Hoffmann-LaRoche, Inc. v. Weinberger* (D.C. Cir. 1975), 425 F. Supp. 890, 893.) In February 1969, regulations governing the filing and contents of ANDA's were adopted. These regulations provided that an ANDA need not contain safety and effectiveness data unless the drug was subject to a drug efficacy study implementation (DESI) notice previously published in the Federal Register.[2]

Later, on July 14, 1970, the FDA published a general notice setting forth the conditions under which a drug subject to a DESI notice could be marketed. The notice essentially provided that manufacturers of me-too drugs without an approved NDA or ANDA must file such documentation. The notice did not explicitly state that a me-too drug could be marketed prior to approval of an abbreviated or full

---

[1] An NDA is a new drug application which is used by a drug manufacturer for any drug which is not generally recognized as safe and effective for use under the conditions prescribed, recommended or suggested in the labeling of the drug. An ANDA is a shortened form of an NDA which may be used by drug manufacturers to gain FDA approval of me-too drugs for which bioavailability is required. " 'Bioavailability' means the rate or extent to which the active ingredient in a drug becomes available to the site of the drug action in the human body." See 40 Fed. Reg. 26161 (1975); *Hoffmann-LaRoche, Inc. v. Weinberger* (D.C. Cir. 1975), 425 F. Supp. 890, 892 n.5.

[2] A drug efficacy study implementation notice requires submission of the clinical data necessary to assure the bioavailability of each drug product.

new drug application. However, in *Hoffmann-LaRoche* (425 F. Supp. at 894), the court determined that the FDA policy of permitting the marketing of me-too drugs violated the regulations set forth in the Act. The FDA did not appeal the *Hoffmann-LaRoche* decision. Instead, on September 22, 1975, the FDA announced in the Federal Register that its July 1970 policy of permitting ANDA's to be filed for me-too drugs and permitting interim marketing was reinstated to the extent that it was consistent with the decision of the *Hoffmann-LaRoche* case.

Our review of the record indicates that the following information was introduced concerning Wyeth's manufacturing of its aminophylline suppositories. Wyeth began manufacturing its aminophylline suppositories in 1945. At that point, correspondence from the FDA indicates that it would not be considered a new drug. Yet, no written or verbal FDA approval ever followed this correspondence, and Wyeth introduced no other evidence to indicate that this drug was ever approved for safety. Prior to 1975, it appears that Wyeth conducted only two studies on its aminophylline suppositories, one study involved testing the product on 5 cats and 14 dogs and the other study tested the suppositories on 14 adult convicts. The purpose of the convicts' study was to determine how quickly an aminophylline in a suppository with a cocoa butter base versus a hydrogenated base is absorbed into a human body. Wyeth ceased manufacturing the aminophylline suppositories in 1982. At that time, Wyeth had still never received FDA approval for the marketing of this drug. Since 1962, the FDA will not approve a prescription drug just for safety or just for efficacy. Both safety and efficacy must be established before FDA approval can be attained. Wyeth no longer distributes the 125 mg. aminophylline pediatric suppository. However, Wyeth presently distributes aminophylline suppositories manufactured by another pharmaceutical company.

Our review of the record further indicates that in 1972 and 1973, the FDA published two DESI notices, one dealing with aminophylline suppositories manufactured by G. D. Searle, and one involving "[a]ll identical, related or similar products, not the subject of an approved new drug application." The gist of these notices was that the drugs involved required an approved NDA and that it would be unlawful to ship any identical, related or similar product, not the subject of such an application. Wyeth did not respond to these two notices.

In 1974, the FDA published a third DESI notice concerning the manufacturing and distribution of aminophylline suppositories. This notice required the submission of either an ADA or an ANDA by

drug manufacturers. Wyeth determined that this notice was applicable to its aminophylline suppositories and thereafter filed its first ANDA with the FDA for approval of its drug. In reply to Wyeth's application, Wyeth was advised by the FDA as follows:

"Adequate data to assure the biologic availability of the drug in the form in which it is to be marketed are currently required. It is suggested that the proposed protocol be submitted for review by our Division of Biopharmaceutics prior to the initiation of any studies."

Wyeth did not submit a protocol to the FDA. Wyeth received a similar notification approximately one year later. In September 1982, Wyeth became aware that its ANDA for its aminophylline suppositories was going to be rejected. Wyeth took no action in response to this knowledge and continued marketing the drug until its ANDA was officially rejected by the FDA in 1983.

We first address Wyeth's contention that the receipt of this evidence constituted prejudicial error. Wyeth specifically argues that the FDA regulations admitted into evidence in this case related solely to drug efficacy, *i.e.*, the bioavailability of a drug, as opposed to safety. Wyeth therefore concludes that such evidence was inadmissible as proof of negligence.

■ Illinois law provides that the violation of a statute or ordinance designed to protect human life or property is *prima facie* evidence of negligence; the *prima facie* evidence of negligence may be rebutted by proof that the party acted reasonably under the circumstances. This principle is applicable to administrative rules, regulations and orders designed to protect human life and property if they are validly enacted and have the force of law. *Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 390, 356 N.E.2d 93, 97.

Initially, it is indisputable that the FDA regulations introduced into evidence were validly enacted and had the force of law. Wyeth, however, contends that notwithstanding the effect of the FDA regulations on the drug industry, the FDA regulations do not concern safety and therefore were not designed to protect Marcus Batteast. We find Wyeth's contention untenable. Regardless of whether the FDA regulations used the term efficacy or safety, their impact was to regulate the distribution of drug products in interstate commerce. Specifically, to insure that me-too drugs are both safe and effective prior to being prescribed by health care professionals to the general public.

■ We cannot accept Wyeth's argument that the requirement that a drug be tested for its efficacy or bioavailability is not a re-

quirement that is related to the safety of the general public, and more specifically Marcus Batteast. Clearly, if a drug is not effective in the treatment of the illness for which it is sold, it cannot be deemed a safe product to market for use in the treatment of such an illness. Yet, the evidence is unrebutted that Wyeth did not obtain express FDA approval of either the safety or efficacy of its aminophylline suppositories for almost 40 years and it continued to market the product.

Additionally, it must be borne in mind that introduction of this evidence was not directive on the issue of Wyeth's liability for manufacturing and marketing its aminophylline suppositories. Our review of the record indicates that Wyeth introduced extensive evidence to rebut plaintiff's claim that it acted unreasonably under the circumstances and that such behavior may have been a proximate cause of Marcus' injuries. The resolution of these issues was clearly a question of fact for the jury to decide based on all the evidence that was introduced and received. We, therefore, find no error in the admission into evidence of the regulations and the corresponding actions taken by Wyeth.

■■ Wyeth also contends that the trial court erred when it allowed plaintiffs' expert witnesses to testify as to an ultimate issue in the case. We disagree. The principle that an expert witness may not give an opinion on an ultimate issue is outdated. (*Anderson v. Chesapeake & Ohio Ry. Co.* (1986), 147 Ill. App. 3d 960, 975, 498 N.E.2d 586, 596, citing *Watson v. State Farm Fire & Casualty Co.* (1984), 122 Ill. App. 3d 559, 461 N.E.2d 57.) As the jury is free to accept or reject the testimony of an expert witness, an expert's opinion on an ultimate issue is admissible evidence on the issue. The admissibility of testimony merely depends upon whether such testimony will aid the jury in its understanding of the facts, rather than whether the testimony relates to an ultimate fact. *Anderson,* 147 Ill. App. 3d at 975, 498 N.E.2d at 596.

■■ In the present case, the disputed questions relate to whether Wyeth's aminophylline suppositories were marketed in compliance with applicable FDA regulations. We believe that the jury had the right to accept or reject the opinion of plaintiffs' expert witnesses that Wyeth's aminophylline suppositories were not marketed in compliance with FDA requirements. Moreover, the testimony of these witnesses concerned requirements in the complex field of prescription drug licensing. The expert witnesses' testimony aided the jury in its understanding of the facts. Thus, we believe that the testimony of plaintiffs' expert witnesses was properly admitted.

█ Wyeth also argues that it was error to give plaintiffs' instruction No. 22 to the jury. Wyeth contends that the regulation at issue in the instruction does not apply to this case and that the giving of such an instruction requires a new trial. Plaintiffs' instruction No. 22 reads as follows:

"There was in force in the State of Illinois and the United States of America, at the time of the occurrence in question, a certain regulation which provided in pertinent part:

\* \* \*

(d) the changes of the following kinds proposed in Supplemental New Drug Applications should be placed into effect at the earliest possible time:

1. The addition to package labeling, promotional labeling, and prescription drug advertising of an additional warning, contra-indication, side-effect, and precaution information.

2. The deletion from package labeling, promotional labeling and drug advertising of false, misleading or unsupported indications for use or claims for effectiveness.

\* \* \*

(e) It will be the policy of the Food and Drug Administration to take no action against a drug applicant solely because changes of the kind described in paragraph (d) of this section are placed in effect by the applicant prior to his receipt of a written notice of approval of the Supplemental New Drug Application.

If you decide that the party violated the regulation on the occasion in question, you may consider that fact together with all other facts and circumstances in evidence in determining whether or not a party was negligent before and at the time of the occurrence."

Initially, we find no merit in Wyeth's argument that because it was not required to submit an NDA or a supplemental NDA, the regulation contained in plaintiffs' jury instruction was not applicable to it. At the time of trial, there was no FDA regulation specifically dealing with the right to file updates and make corrections to ANDAs through the use of supplemental ANDAs. Clearly, the regulation at issue must be interpreted in a manner which gives it a clear and logical meaning rather than a meaning which renders it illogical, useless or unreasonable. The entire FDA regulations serve to protect the public and provide drug manufacturers with a cohesive set of guidelines and regulations for the safe and effective manufacturing of their products. As such, we believe that the regulation at issue

was implemented for the protection of the consuming public by assuring all drug manufacturers that they would not be penalized for either deleting from, or adding to, their drug's package labeling prior to FDA approval of these changes. To adopt Wyeth's position and conclude that the regulation applies only to those drug products covered by an approved NDA would be to counteract the purpose of the FDA regulations. We decline to reach such a result.

Moreover, the question of what issues have been raised is within the sound discretion of the trial court. (*Friedman v. Park District* (1986), 151 Ill. App. 374, 390, 502 N.E.2d 826, 838.) Considerable discretion is given the trial court in this regard. As a result, an instruction is justified if it is supported by some evidence in the record. (*Freidman,* 151 Ill. App. at 390, 502 N.E.2d at 838.) Our review of the record indicates that there was sufficient evidence to support giving the jury plaintiffs' instruction No. 22.

■■■ Wyeth next argues that the trial court committed reversible error when it granted plaintiffs' motion *in limine* and thereby prohibited Wyeth from cross-examining Dela Cruz concerning the terms of the settlement agreement he entered into with plaintiffs. Wyeth essentially contends that because Dela Cruz was dismissed as a codefendant pursuant to a settlement agreement, Wyeth had a right to cross-examine Dela Cruz regarding the terms of the settlement agreement to show interest, bias or a motive to fabricate. We disagree.

Plaintiffs and Dela Cruz executed an agreement which provided that Dela Cruz would personally pay plaintiffs $25,000, and his insurer would pay plaintiffs $200,000. Following the payment of $225,000 to plaintiffs, Dela Cruz was dismissed as a codefendant with prejudice pursuant to the terms of the settlement agreement. The settlement agreement specifically required Dela Cruz to be available to testify at trial if called as a witness by any party. At the time of his dismissal from the case, Dela Cruz was residing in Hawaii and was not subject to the jurisdiction of the Illinois courts. Pursuant to an *in limine* order, entered over Wyeth's objection, the trial court precluded Wyeth from questioning Dela Cruz concerning his settlement agreement with plaintiffs. The trial court instructed the parties that the jury could only be advised that the dispute between plaintiffs and Dela Cruz had been "resolved."

It is well established that a witness may be impeached by a showing of interest, bias or motive to falsify testimony. However, the latitude permitted a party to establish bias during cross-examination is not limitless, but rather rests within the sound discretion of the

trial court. A court of review will not interfere with a trial court's discretion, unless there has been a clear abuse of discretion. *Cummings v. Chicago Transit Authority* (1980), 86 Ill. App. 3d 914, 919, 408 N.E.2d 737, 741.

We have examined the agreement in question, and we believe that the terms of the agreement, when read in their entirety, inured equally to the benefit of all the parties. Moreover, after examining the testimony of Dela Cruz, we further believe that any questioning of Dela Cruz regarding the agreement would not have demonstrated bias other than that which was apparent from his previous deposition testimony, which testimony was vigorously gone into at trial. The jury was informed that while Dela Cruz was formerly a defendant in the cause of action, he was no longer a party because the dispute between he and plaintiffs had been resolved. As such, any interest Dela Cruz had in testifying was apparent to the jury.

We, therefore, do not believe that the trial court's order precluding Wyeth from questioning Dela Cruz as to the particulars of his settlement agreement with plaintiffs either unfairly prejudiced Wyeth or unfairly benefited plaintiffs. Accordingly, we find no error in the trial court's exclusion of evidence regarding the terms of the settlement agreement.

■■ We next address Wyeth's argument that the trial court erred in refusing to grant Wyeth's motion for a mistrial based upon allegedly improper statements made by plaintiffs' counsel during rebuttal argument to the jury. According to Wyeth, prejudicial error occurred when plaintiffs' counsel allegedly explained the significance and effect of a special interrogatory to the jury during rebuttal argument. We disagree.

The special interrogatory addressed the issue of whether the conduct of the Hospital was the sole proximate cause of Marcus' injury. During rebuttal argument, plaintiffs' counsel stated to the jury:

"The final decision, obviously is yours. There is a Special Interrogatory that you have to answer. If you want to award Marcus money from the drug company, that the Hospital was not the sole cause incidentally, proximate cause is any cause that contributes to the injury. Any one. A cause.

It does not have to be the last, or does not have to be the first. It is any cause that happens along the way to create the problem.

You have to answer that Interrogatory that the Hospital was not the sole cause of Marcus' condition.

If you want to give Marcus money from American Home

Products and Wyeth, then you have to sign the form that the hospital was not the sole cause."

Wyeth objected to the latter part of counsel's statement.

In *Sommese v. Maling Brothers, Inc.* (1966), 36 Ill. 2d 263, 266-68, 222 N.E.2d 468, 470-71, the court determined that an improper argument occurs if (1) a counsel informs the jury of the source of a special interrogatory and (2) the purpose of the special interrogatory is defeated by counsel advising the jury to protect its verdict by conforming its answer to the special interrogatory with its verdict. However, it is not improper argument for an attorney to suggest how a special interrogatory should be answered, as long as the jury is not admonished to conform its answer to its verdict. *Burns v. Howell Tractor & Equipment Co.* (1977), 45 Ill. App. 3d 838, 848, 360 N.E.2d 377, 385; *Macias v. Inland Steel Co.* (1986), 147 Ill. App. 3d 411, 418, 497 N.E.2d 1206, 1211.

Based upon the record before us, we find no error in counsel's argument to the jury. Counsel was merely arguing his version of the issue of proximate cause to the jury as it related to the special interrogatory. (See *Macias,* 147 Ill. App. 3d at 418, 497 N.E.2d at 1211.) At no time was the jury advised of the legal significance of conforming its answer to the special interrogatory to the general verdict. Nor was the source of the special interrogatory ever disclosed. (*Burns,* 45 Ill. App. 3d at 848-49, 360 N.E.2d at 386.) We therefore find no error in the trial court's denial of Wyeth's motion for a mistrial.

Wyeth further argues that it was deprived of a fair trial as a result of the trial court's improperly instructing the jury in a manner which unduly emphasized the alleged defects in Wyeth's package insert. Wyeth contends that plaintiffs' instructions Nos. 19, 20, 21 and 33 unduly emphasized these alleged defects, were repetitious, and prejudicial. We disagree.

In Illinois, it is the duty of the court to inform the jury of a plaintiff's claims and a defendant's responses. An issue instruction is proper if it summarizes the pleadings in a succinct manner without undue repetition or emphasis. (*Jeffers v. Weinger* (1985), 132 Ill. App. 3d 877, 885, 477 N.E.2d 1270, 1276.) However, in cases involving multiple issues, some overlapping of instructions is unavoidable. (See *Newton v. Meissner* (1979), 76 Ill. App. 3d 479, 394 N.E.2d 1241.) We have examined the instructions at issue, and we have examined the instructions as a whole. We conclude that the jury was properly instructed.

Wyeth also assigns as error the trial court's denial of its motion

to dismiss plaintiffs' complaint and vacate the judgments entered thereon. Wyeth sought the dismissal based upon an agreement entered into on May 23, 1984, between plaintiffs and Dr. Abella, one of Marcus' treating physicians. Wyeth contends that the agreement between plaintiffs and Abella was a release, rather than a covenant not to sue. Wyeth therefore argues that based on the strict common law rule that a release of one tortfeasor releases all tortfeasors, Wyeth was discharged from any alleged liability to plaintiffs when the agreement was executed. We disagree.

The agreement entered into between plaintiffs and Abella provides:

> "IN CONSIDERATION of the payment *** [of] *** ($35,000), the receipt of which is hereby acknowledged, the undersigned *** do hereby release and forever discharge Dr. Joe Abella and *** his *** heirs, executors, administrators, agents, successors, and assigns of and from any and all actions, causes of action, claims, demands, damages, costs, loss of services, expenses and compensation, on account of, or in any way growing out of, any and all known and unknown personal injuries and property damage resulting or to result from *** the [injuries to Marcus].

> It is expressly understood and agreed that the above named sum paid is the sole consideration of this release ***. This release contains the ENTIRE AGREEMENT between the parties hereto ***."

We need not consider what effect, if any, the provisions regarding releases in "An Act in relation to contribution among joint tortfeasors" (Ill. Rev. Stat. 1987, ch. 70, par. 301 *et seq.*) would have had here, since the relevant events in this case preceded its enactment. (*Porter v. Ford Motor Co.* (1983), 96 Ill. 2d 190, 196, 449 N.E.2d 827, 831.) At the time that plaintiffs and Abella executed the agreement, Illinois law provided that a release relating to one indivisible injury given to any of those tortfeasors concurring in its cause releases all other joint tortfeasors. (*Porter*, 96 Ill. 2d at 195, 449 N.E.2d at 830-31; *Alsup v. Firestone Tire & Rubber Co.* (1984), 101 Ill. 2d 196, 461 N.E.2d 361.) However, a covenant not to sue is an instrument which restricts only the right of an individual to maintain an existing cause of action against a particular party. Such an agreement neither extinguishes the cause of action nor does it discharge any other individuals not a party to the agreement. *Brown v. Timpte Inc.* (1985), 137 Ill. App. 3d 1053, 1057, 485 N.E.2d 488, 490-91.

While the agreement in question is entitled "RELEASE OF ALL

CLAIMS," such a designation is not controlling in determining the legal effect of the document. Rather, where the legal effect of such a document is in dispute, the essential fact to be determined is the intention of the parties as reflected by all of the wording in the document and the circumstances under which the document was executed. The determination is a question of fact. *Essington v. Parish* (7th Cir. 1947), 164 F.2d 725, 729-30.

■■■ Here, the agreement was entered into solely between plaintiffs and Abella. Wyeth was never a party to the negotiations preceding the agreement. The agreement itself does not contain the all-inclusive language of the type usually found in releases. It does not purport to release Wyeth or any other party or entity that might in any manner be liable for Marcus' injury. Nor does the instrument state that the payment received by plaintiffs was "in full satisfaction" of plaintiffs' claim. (See *Porter*, 96 Ill. 2d 190, 449 N.E.2d 827.) Rather, the agreement only makes reference to Abella and "his heirs, executors, administrators, agents, successors, and assigns." Plainly, there is no language in the document which in any way implies that the agreement was intended to benefit any tortfeasor other than Abella.

In the trial court, after hearing arguments of counsel, the trial court denied Wyeth's motion to dismiss relating to the release. While the trial court did not articulate a reason for its decision, implicit in the trial court's ruling is a determination that based on the facts and circumstances surrounding its execution and the wording of the agreement itself, the intention of the parties was that the agreement was to have the legal effect of a covenant not to sue rather than a release. We find no reason to disturb the trial court's ruling.

■■■ We next address the issue of the amount of compensatory damages. The evidence relating to this issue is hardly disputable. Following his transfer to Children's Memorial Hospital, Marcus was diagnosed as being blind and deaf. These conditions eventually abated. However, Marcus sustained other grave injuries which will never abate. Since the age of two years, he has suffered from permanent brain damage. As a result of his brain damage, Marcus, presently age 14, has an I.Q. of approximately 32, the equivalent of a two- or three-year-old child. Also, Marcus suffers from epilepsy, a condition he did not have prior to his injury. In summary, Marcus is a former healthy child, both mentally and physically, who has suffered grave and permanent physical injuries and lacks the mental capacity to develop into a self-sufficient adult capable of appreciating the bare enjoyments of human life.

While the amount of compensatory damages was not subject to scientific computation, it was subject to the discerning eye and keen intellect of a commensal cross-section of the community who sat as the jury. In reaching their verdict, the jurors applied their intellectual perceptions to all the evidence in light of their own observations and experiences in the affairs of life. Plainly, reviewing court judges are not in as good a position as a jury to discern or evaluate evidence. Therefore, the observations and experiences in the affairs of life of reviewing court judges cannot take precedence over those of the jury when it comes to determining how much money is reasonable compensation for injuries and suffering. Thus, a jury's award should not be disturbed on review as excessive unless it is shocking to the judicial conscience. Moreover, the judicial conscience must evolve with changing times so that it is still not shocked by the amount of a verdict that was also shocking to the community in the past, but is now consistent with current societal mores and demands. In the instant case, we cannot say that the amount of compensatory damages is shocking to a judicial conscience with a present-day awareness. We therefore do not believe that the amount of compensatory damages awarded by the jury should be disturbed.

Wyeth next contends that the trial court should not have submitted the issue of punitive damages to the jury and that there is no evidence to support a verdict for punitive damages. We disagree.

Initially, we believe that the evidence we previously discussed is amply sufficient to support the trial court's decision to submit the issue of punitive damages to the jury. As to the jury's verdict on the issue, if the jury believed that Wyeth was guilty of willful and wanton conduct which proximately caused plaintiff to be injured, and if the jury believed that justice and the public good require it, it was proper for the jury to award plaintiffs an amount which will serve to punish Wyeth and deter others from the commission of like offenses. Willful and wanton conduct is a course of action which shows deliberate intention to harm or shows an utter indifference or conscious disregard for the safety of others.

Here, if it is believed, the evidence relating to Wyeth's failure to warn the medical profession of aminophylline's dangerous propensity to children and Wyeth's failure to provide sufficient information for methods of avoiding toxicity and overdose therapy when the drug was being used, coupled with Wyeth's awareness and failure to warn the medical profession of the risks which we have previously detailed, shows an utter indifference to or conscious disregard for the safety of others. The jury believed the pertinent evidence that was

presented, which it had a right to do. Thus, we do not find that the jury's verdict on the issue of punitive damages is contrary to the manifest weight of the evidence. We therefore conclude that the trial court properly submitted the issue of punitive damages to the jury and that the jury's determination on the issue of punitive damages should not be superseded on review.

 Wyeth also contends that the amount of punitive damages awarded is excessive. We believe that the principles which we have previously discussed relating to the jury's province to determine the amount of compensatory damages is equally applicable to punitive damages. Moreover, although there is authority in Illinois holding that the amount of punitive damages does not have to be proportional to the amount of compensatory damages (*Tague v. Molitor Motor Co.* (1985), 139 Ill. App. 3d 313, 318, 487 N.E.2d 436, 439), we need not be concerned with that issue in this case because the amount of punitive damages is plainly proportional to the amount of compensatory damages. We therefore believe that the only significant issue relating to the amount of punitive damages is whether the amount is commensurate with the nature and enormity of the wrong committed.

We believe that the enormity of the wrong committed here is not only very grave, but it is exacerbated by the type of business and the kind of product that is involved. The potential for harm to the public when a drug manufacturer shows an utter indifference to or conscious disregard for the safety of others is frightful. Thus, the jury had a right to conclude that the punitive damages must be sufficient not only to punish Wyeth but also to deter other drug manufacturers from the commission of like offenses. The only meaningful way that punitive damages against Wyeth will be sufficient is to make the amount of the punitive damages high enough to have a sentient effect upon those who profit from manufacturing drugs for human consumption. Under the circumstances, we believe that the amount of punitive damages awarded by the jury is not excessive, but rather is within the realm of adequacy. We see no need to hold that the jury did not have the right to do what it did in awarding punitive damages.

 We next consider plaintiffs' cross-appeal. The cross-appeal relates to plaintiffs' second consolidated complaint. In count XII, plaintiffs, James and Shirley Batteast, sought recovery for the loss of society and companionship of their son, Marcus. Count XII was dismissed on April 25, 1984. Initially, plaintiffs emphasize that since the dismissal of count XII, Illinois has recognized that parents are enti-

tled to maintain an action for loss of a child's society and companionship resulting from an injury that is not fatal. (*Dralle v. Ruder* (1986), 148 Ill. App. 3d 961, 500 N.E.2d 514, *appeal allowed* (1987), 113 Ill. 2d 573.) However, we believe that the *Dralle* case is not applicable here because count XII was properly dismissed on the basis that the alleged action was not filed in apt time.

Marcus was injured in February 1976. Section 13—203 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 13—203) states:

> "Actions for damages for loss of consortium or other actions deriving from injury to the person of another, *** shall be commenced within the same period of time as actions for damages for injury to such person."

Section 13—202 states that actions for damages for personal injuries shall be "commenced within 2 years next after the cause of action accrued." (Ill. Rev. Stat. 1983, ch. 110, par. 13—202.) Here, since Marcus' injuries occurred in February 1976, plaintiffs had until the anniversary date of the injury in February 1978 to file a timely claim for loss of society and companionship of Marcus. However, plaintiffs did not attempt to allege a cause of action against Wyeth for the loss of society and companionship of Marcus until April 1984, six years after the expiration of the applicable limitations period. Therefore, we agree with Wyeth that the cause of action alleged by plaintiffs in count XII was barred by the limitations period for filing the action.

Plaintiffs argue that count XII was timely filed pursuant to section 2—616(b) (Ill. Rev. Stat. 1983, ch. 110, par. 2—616(b)), which provides:

> "The cause of action, cross claim or defense set up in any amended pleading shall not be barred by lapse of time under any statute or contract prescribing or limiting the time within which an action may be brought or right asserted, if the time prescribed or limited had not expired when the original pleading was filed, and if it shall appear from the original and amended pleadings that the cause of action asserted, or the defense or cross claim interposed in the amended pleading grew out of the same transaction or occurrence set up in the original pleading ***."

Plainly, in order for a plaintiff to utilize section 2—616(b), a defendant against whom a new cause of action is asserted must have been joined as a party to the lawsuit prior to the running of the limitations period governing the new cause of action. In the present case, plaintiffs' action against Wyeth was filed on July 18, 1980. In

1984, the action against Wyeth was consolidated with the action that had been filed in 1977 against other defendants. As a result, although the original action in this consolidated case was filed in 1977, the cause of action asserted against Wyeth in count XII could only relate back to the cause of action that had been filed in 1980 and not back to the action plaintiffs filed against the other defendants in 1977. Since the two-year period in which plaintiffs could have filed a cause of action for the loss of society and companionship of Marcus expired in February 1978, plaintiffs' argument that count XII was timely filed pursuant to section 2—616(b) (Ill. Rev. Stat. 1983, ch. 110, par. 2—616(b)) is untenable. The trial court therefore properly dismissed count XII of plaintiffs' second consolidated complaint.

Accordingly, the judgment of the circuit court of Cook County is affirmed in all respects.

Affirmed.

WHITE, P.J., and LORENZ,* J., concur.

---

*Justice McGillicuddy heard oral arguments in this case prior to her retirement. Justice Lorenz was designated the third member of the panel and has read the briefs.