WILLIAM ALTSZYLER, Plaintiff-Appellee, v. HORIZON HOUSE CONDOMINIUM ASSOCIATION *et al.*, Defendants-Appellants.

First District (3rd Division)   No. 85—1283

Opinion filed September 14, 1988.

94

Wildman, Harrold, Allen & Dixon, of Chicago (Howard T. Brinton and Ruth E. VanDemark, of counsel), for appellants.

Corboy & Demetrio, of Chicago (Philip H. Corboy, Robert A. Clifford, and David A. Novoselsky, of counsel), for appellee.

JUSTICE RIZZI delivered the opinion of the court:

This is a personal injury action brought by plaintiff, William Altszyler, against defendants Horizon House Condominium Association (Association), Arthur Rubloff & Company (Rubloff), and the City of Chicago (City). The action charges defendants with negligence. The Association and Rubloff are appealing from a judgment entered upon a jury verdict against them and in favor of plaintiff. The amount of the verdict was $943,129.93, which was reduced to $801,660.44 to reflect the jury's finding that plaintiff was 15% negligent. A directed verdict and judgment was entered in favor of the City, from which no appeal has been taken. We affirm the judgment against the Association and Rubloff.

On May 11, 1977, at approximately 5 p.m., plaintiff, age 29, was riding a 10-speed bicycle northbound on the sidewalk on the east side of the 5700 North block of Sheridan Road. He was riding at a leisurely pace, seated on the bicycle and leaning forward with both hands holding the handlebars. When the bicycle went over a grade differential in the sidewalk, the front wheel disengaged and the bike collapsed. Plaintiff was thrust forward over the handlebars and hit his head on the sidewalk, causing him to be seriously injured.

A motorist, Gary Leahy (Leahy), and his wife, witnessed the occurrence. Leahy stopped his auto, and he and his wife ran over to help plaintiff, who was lying on the sidewalk. An ambulance was called and plaintiff was taken to a hospital. He suffered brain trauma from the occurrence and has no recollection of anything that happened on May 11, 1977. Leahy testified how the occurrence took place.

The grade differential in the sidewalk is the result of a height difference of about three inches between two concrete sidewalk slabs. The east side of the higher sidewalk slab abuts a 3½- to 4-foot-high concrete retaining wall that is on the property of the Horizon House. The Horizon House is a 32-story condominium building located at 5733 North Sheridan Road. The Horizon House is owned by the Association and is managed by Rubloff.

The Horizon House building is set back approximately 200 feet from the east side of Sheridan Road. The building's parking lot is in front of the building and is enclosed by the 3½- to 4-foot-high concrete retaining wall which abuts the sidewalk on Sheridan Road. The sidewalk runs about 237 feet from the south end to the north end of the Horizon House property line. The concrete retaining wall runs north and south parallel to the sidewalk and stops short 4.68 inches south of the north end of the Horizon House property line. It then runs west and east, perpendicular to the sidewalk on Sheridan Road, along the north side of the parking lot.

When Horizon House was built in 1966, an old house was located at 5747 North Sheridan Road, which is the property immediately north of the Horizon House. The old house was set on land which "rose three feet or more" from the sidewalk and was separated from the sidewalk by a concrete retaining wall which was about 1½ feet high. Although the old house had been razed and the vacant property was being used for parking at the time of plaintiff's accident, the concrete retaining wall remained.

John Fritsch was employed by Rubloff as a janitor in charge of maintenance at the Horizon House from March 1, 1966, until 1982. He was employed as the head janitor at Horizon House in 1966 when the Horizon House and the sidewalk in front of the building were built. According to Fritsch, after the Horizon House was built, the sidewalk slab immediately north of the north end of the Horizon House property line began to shift and sink, creating a depression or difference in height of about three inches between that sidewalk slab and the sidewalk slab at the north end of the Horizon House property line. The north end of the higher sidewalk slab was in line with the north end of the Horizon House property line. The south end of the lower sidewalk slab was in line with the south end of the property line for 5747 North Sheridan Road.

Fritsch stated that the deterioration in the grade of the sidewalk slabs was caused by weather which washed down from between the 3½- to 4-foot concrete retaining wall that was built on the Horizon House property and the retaining wall at the edge of the property at

5747 North Sheridan Road. The water would accumulate on the sidewalk and wash away the dirt and sand supporting the sidewalk. This action caused the sidewalk slab next to the sidewalk slab at the north end of the Horizon House property line to sink. The sidewalk slab at the north end of the Horizon House property remained level. Fritsch attempted to correct the grade differential between the two sidewalk slabs by putting concrete in the space that had been created between the two slabs. However, when the water continued to drain on the sidewalk, the concrete cracked and the sidewalk slab continued to sink.

In the spring of 1977, Fritsch saw hundreds of bicyclists everyday riding up and down the sidewalk in front of Horizon House. The bicyclists would use the sidewalk on trips to and from the nearby beachfront park. Several witnesses testified that there was heavy traffic on Sheridan Road which necessitated the use of the sidewalk by bicyclists. Fritsch stated that he was aware that the grade differential between the sidewalk slabs created a problem for the bicyclists. He testified:

"Well, the elevation was too high and they would just go around it instead of going right over it."

Fritsch also testified that when the bicyclists would go around the sidewalk slabs with the grade differential, they would cross over and damage the parkway lawn abutting the sidewalk in front of the Horizon House. Fritsch took measures to protect the parkway lawn by putting two stakes in the lawn next to the uneven sidewalks slabs, and he put a chain across the stakes. He testified:

"They would ride on the lawn and then I put the chain across there so they couldn't go on the lawn and the chain was torn down and then I filled the hole with concrete."

Later, when filling the hole with concrete did not prove satisfactory, Fritsch put a rock and stone on the parkway lawn to prevent bicyclists from traversing onto the parkway lawn when attempting to avoid the depression between the two sidewalk slabs. Fritsch testified that he saw bicyclists actually stop and get off their bicycles to avoid the drop in the elevation between the sidewalk slabs. Fritsch also testified that neither he nor anyone from Horizon House had ever notified the City of the depression or differential grade level in the sidewalk.

George A. Kennedy, an engineer, testified that there had been a grade differential about three inches between the sidewalk slabs and that such a differential would be unsafe for bicyclists or pedestrians. Kennedy testified that when Horizon House was built, the builders

left a 4½- to 5-inch gap between the concrete retaining wall they built on the north end of the Horizon House property and the concrete retaining wall that existed on the property immediately north of the Horizon House property. The gap between the two walls created an opening which funneled drainage water onto the sidewalk, which in turn caused one of the concrete slabs to sink. As a result, the grade differential of about three inches between the two sidewalk slabs developed.

Defendants first contend that, "at the heart of this appeal is the central and overriding issue of duty." Defendants argue that as a matter of law, no duty running from defendants to plaintiff existed. To support this position, defendants argue that they owed no duty (1) of special care in relation to the defective sidewalk slab as a nonabutting owner and manager; (2) to prevent rainwater from running onto the sidewalks; (3) to build on the property lines; (4) to install a catch basin; (5) to preserve the retaining wall; (6) to replace or rebuild the defective sidewalk; (7) to repair the sidewalk; and (8) to notify the City of the depression. We agree with defendants that the central and overriding issue in their appeal is whether they owed plaintiff a duty with respect to the use of their property.[1] However, we disagree with defendants' arguments that they owed plaintiff no duty.

Initially, we observe that defendants misstate the Association's relationship to the sidewalk involved in the incident. Defendants state that the Association is a nonabutting landowner with respect to the incident. However, the record demonstrates that the incident occurred as a result of the different grade level between the sidewalk slab abutting the Association's property and the sidewalk slab immediately to the north. It follows that the unsafe condition causing the incident lies in part on the sidewalk abutting the property belonging to the Association. Thus, the Association is an abutting landowner rather than a nonabutting landowner with respect to the sidewalk involved in the incident.

As to defendants' duty, it is a basic principle of law that a landowner has no duty to a pedestrian using a public sidewalk abutting the land from harm that may be caused by a natural condition of the land. However, to be free from negligence, a landowner does have a duty of ordinary care to a pedestrian using a public sidewalk abut-

---

[1]For convenience, unless otherwise indicated, any reference we make in this opinion to the owner of the property refers to both the owner and manager of the property. We make no distinction in our opinion between the duty or liability of the defendant owner and the defendant manager of the property since defendants make no such distinction and they are both represented by the same law firm in this case.

ting the land for harm that may be caused by a nonnatural condition of the land. (*Bansch v. Donnelly* (1979), 77 Ill. App. 3d 922, 396 N.E.2d 869; see Restatement (Second) of Torts §§363, 364 (1965); 18 A.L.R.3d 428, 433 (1968); W. Keeton, Prosser & Keeton on Torts §57, at 388-91 (5th ed 1984); see also Illinois Pattern Jury Instructions, Civil, No. A10.04 (2d ed. Supp. 1981) (defining ordinary care and negligence).) A natural condition of the land means that the condition has not been changed by any act of a human being. This includes acts of the possessor, any of his predecessors in possession or a third person dealing with the land with or without the consent of the then possessor. A natural condition of the land also includes the natural growth of trees, weeds, and other vegetation upon land not artificially made receptive to them. On the other hand, a structure erected upon land is a nonnatural or artificial condition. Also considered nonnatural or artificial conditions are trees or plants planted or preserved, and changes in the surface by excavation or filling, irrespective of whether they are harmful in themselves or become so only because of the subsequent operation of natural forces. Restatement (Second) of Torts §363, comment *b* (1965).

The duty of an abutting landowner for the creation of a dangerous condition on a public sidewalk caused by a nonnatural condition of the land (including drainage water caused by the erection of a retaining wall on the land) is demonstrated by the following statement in 18 A.L.R.3d 428, 432 (1968):

"Thus, the owner of property abutting on a sidewalk on which a pedestrian was injured in a fall on ice has frequently been held liable for such injuries where the accumulation of the water forming the ice was due to the manner of construction or maintenance of gutters, conductor pipes, spouts, or the like, on the abutting property, or it was due to the manner of construction or maintenance of such other structures as eaves, cornices, ledges, porticoes, awnings, canopies, marquees, bay windows, signs, *retaining walls*, hedges, driveways, or the door of a cellarway." (Emphasis added.)

Here, the differential grade level in the sidewalk was caused by the Association's leaving a 4½- to 5-inch gap between the concrete retaining wall which it built on the north end of its property and the concrete retaining wall that already existed on the property immediately north of the Association's property. The gap between the two walls created an opening which funneled drainage water onto the sidewalk. The water that was funneled onto the sidewalk had no place to drain except between and underneath the sidewalk slabs. As the

excess water permeated the dirt under one of the sidewalk slabs, the dirt was washed away. This action left a void in the dirt support for the sidewalk slab, causing the slab to slowly sink into the void, which in turn caused the depression and differential grade level with the other sidewalk slab. Kennedy testified that the unnatural drainage water could have been avoided by (1) eliminating the gap between the concrete wall that was constructed on the north end of the Association's property and the concrete retaining wall that existed on the property immediately to the north or (2) building a catch basin on the Association's property.

Under the circumstances it is plain that the Association is an abutting landowner with respect to the incident and that the differential grade level in the sidewalk was caused by a nonnatural condition of the Association's land. Therefore, defendants owed a duty of ordinary care to plaintiff for injuries caused by the differential grade level in the sidewalk.

We must address defendants' contention that "plaintiff failed to establish proximate causation by competent expert testimony." Defendants argue that plaintiff failed to establish by competent expert testimony that (1) rainwater caused the sidewalk to sink; (2) the depression caused by the sidewalk panel was the proximate cause of the bicycle's collapse; and (3) any affirmative act of the Horizon House janitor was the proximate cause of the bicycle's collapse.

In defendants' first argument under this point, defendants state that the trial court erred in permitting Fritsch to testify as to his observations of what "caused the deterioration and tilt of the nonabutting sidewalk over the years" because he is not an engineer and was not an expert witness. Also, defendants claim that since plaintiff's expert witness, Kennedy, testified as an expert based upon facts supplied by Fritsch and photographs, "plaintiff failed to establish as a matter of law that the rainwater flowing onto the nonabutting sidewalk panel was the proximate cause of that panel's deterioration and depression." We disagree with defendants' arguments.

If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue. (See Fed. R. Evid. 701.) In the present case, Fritsch's testimony as to what he observed happened to the sidewalk and the cause of what happened to the sidewalk was rationally based on his own perception and was helpful to a clear understanding of his testimony and the determination of a fact in issue.

Moreover, his testimony was not inadmissible merely because it may have embraced an ultimate issue to be decided by the jury. (See Fed. R. Evid. 704.) Also, we have examined the testimony of plaintiff's expert, Kennedy, and we do not find that his testimony was improper or unbelievable as to the proximate cause of the differential grade level of the sidewalk.

■ Next, defendants' claim that plaintiff failed to establish by competent expert testimony that the condition of the sidewalk was a proximate cause of the bicycle's collapse is specious. Here, an eyewitness testified that plaintiff was riding his bicycle at a leisurely pace. When the bicycle went over the grade differential in the sidewalk, the front wheel disengaged and the bike collapsed. Thus, no expert witness was needed by plaintiff to prove that the condition of the sidewalk was a proximate cause of the bicycle's collapse. Moreover, the fact that defendants produced an expert witness who testified that in his opinion the bicycle wheel would not disengage under the circumstances presented does not require the jury to believe the expert witness. The jury had a right to believe the testimony of the disinterested eyewitness rather than the opinion testimony of a hired partisan. See generally *Trower v. Jones* (1988), 121 Ill. 2d 211, 520 N.E.2d 297 (discussing the partisan testimony of an expert witness as opposed to the testimony of a factual witness).

In view of the conclusions which we have already stated, we need not separately address defendants' claim that plaintiff failed to establish by competent expert testimony that any affirmative act of their agent, Fritsch, was the proximate cause of the bicycle's collapse. However, we note that the record plainly reflects that Fritsch knew of the differential grade level in the sidewalk and took affirmative, but insufficient, acts to remedy the unsafe condition created by defendants.

■ We next consider the claim of defendants that the trial court erred when it granted a directed verdict in favor of the City based on a lack of evidence to establish that the City had notice of the unsafe condition of the sidewalk. The Association and Rubloff argue that they were prejudiced by the alleged erroneous ruling and "had the trial gone to verdict against the City as well as against them, they would have had a viable indemnity action against the City based on the overriding, nondelegable duty of the City to maintain its sidewalks and the City's constructive notice of the depression."

Defendants have never filed an indemnity action or a third-party action against the City. No appeal has been taken against the City, and the City has never been a party to this appeal. The plaintiff,

against whom the directed verdict in favor of the City was entered, does not challenge or seek relief as to the directed verdict. Under the circumstances, we conclude that defendants lack appellate standing to challenge the directed verdict in favor of the City. (See *Montgomery v. Terminal R.R. Association* (1979), 73 Ill. App. 3d 650, 655, 392 N.E.2d 77, 81-82.) Moreover, the record demonstrates that defendants did not object when the directed verdict in favor of the City was entered in the trial court. Thus, if there was error for which defendants had appellate standing as to the directed verdict in favor of the City, the error was waived. In reaching our conclusion, we note that the fact that a municipality may be liable because of a failure to carry out its duties with respect to the maintenance or care of its sidewalks does not relieve the abutting landowner from liability where he is otherwise liable for discharging water on the sidewalk which results from a nonnatural condition of his land. *Loyd v. City of East St. Louis* (1925), 235 Ill. App. 353, 357-58 (holding both the abutting landowner and the city liable); 18 A.L.R.3d 428, 439 (1968).

■ Defendants also contend that the verdict as to liability was against the manifest weight of the evidence. They argue that the evidence does not support a finding that (1) the Association was an abutting property owner; (2) rainwater caused the defective sidewalk slab to sink; (3) rainwater on the sidewalks was due to the negligent construction or maintenance by the Association; (4) the depression was dangerous and the proximate cause of the plaintiff's injury; and (5) the stakes, a rock, or a cement patch was present at the time of the accident, created a hazardous condition, or was the proximate cause of plaintiff's injury. We believe that all of these arguments involve issues that were questions of fact for determination by the jury. The jury having decided the issues, we see no compelling reason to disturb the jury's verdict. The inquiry on appeal is not whether other conclusions are possible, but rather whether the result reached is reasonable. (*Nunley v. Village of Cahokia* (1983), 115 Ill. App. 3d 208, 214, 450 N.E.2d 363, 367.) We believe that for the reasons previously stated herein, the verdict as to liability in this case is reasonable and therefore not against the manifest weight of the evidence.

■ Defendants next contend that the jury's finding of 15% comparative negligence is against the manifest weight of the evidence. On this point, defendants first state that "the plaintiff was not an occasional bicyclist but used his bicycle along with the CTA as his sole means of transportation. If the depression was dangerous, a reasonably prudent bicyclist would have observed that danger and avoided the impact of the depression by walking the bike or riding onto the

parkway." Defendants also state that the finding of 15% comparative negligence "is against the manifest weight of the evidence because the plaintiff knew of safer and legal alternative routes to the sidewalks," and that the proximate cause of the accident was improper maintenance of the bicycle. Plainly, defendants' arguments relate to questions of fact which were within the province of the jury to decide, and there is nothing in this record to suggest that the jury's verdict is unreasonable. We therefore do not find that the jury's finding of 15% comparative negligence is against the manifest weight of the evidence.

The next point raised by defendants is that the trial court erred in giving two instructions to the jury. Specifically, defendants' arguments relate to an instruction concerning whether the Association was an abutting landowner to the sidewalk where the incident occurred and whether defendants had a duty to maintain their premises so as to avoid creating a dangerous condition on the sidewalk. Since we have already decided and discussed these issues adversely to the defendants in related arguments raised by defendants, we conclude that the trial court did not err in giving the jury the two instructions for the reasons we have previously stated.

Referring to the transcript where the court read the instructions to the jury, defendants also assert that the trial court erred in not reading defendants' instruction No. 4. However, if the trial court failed to read an instruction to the jury, it was the responsibility of defendants to call that fact to the trial court's attention. Here, defendants sat silently during and after the reading of the instructions and never complained to the trial judge that any instructions were not read to the jury. Moreover, since the record reflects that defendants' instruction No. 4 is marked "Given," we can presume that the written instruction was physically given to the jury along with all the other written instructions. There is nothing in the record to indicate, and defendants do not contend, that any of the written instructions were not physically given to the jury.

Under the circumstances, we believe that defendants acquiesced to any purported omission of the reading of defendants' instruction No. 4 to the jury and that the written instruction was physically given to the jury along with all the other written instructions. A trial is an adversary proceeding, which means that if an error occurs it is the responsibility of the aggrieved party to call the matter to the trial judge's attention when the error occurs. It follows that a party may not sit silently and acquiesce to the omission of the reading of an instruction to the jury and then raise the omission as error on appeal.

We therefore conclude that defendants waived any error regarding defendants' instruction No. 4.

■ Defendants next claim that "the award of damages was beyond the flexible range of what is reasonably supported by the evidence." Plaintiff was 29 years old at the time of the occurrence, and he was employed, with no apparent disabilities. He was in good physical condition, with normal eyesight. A doctor testified that when the accident occurred, "the injury had been so violent that it had opened the skull as Mr. Altszyler sustained the fall." Plaintiff had extensive brain surgery. He has suffered severe brain damage and he is legally blind in his left eye, with permanent damage to the optic nerve. The vision in his right eye has also been seriously impaired and it is deteriorating as a result of the injury he suffered in the accident. He also suffered a permanent loss of smell. His mobility has been severely affected by his brain damage and visual problems. A doctor who regularly examines and evaluates patients for the State of Illinois Rehabilitation Service testified that plaintiff is virtually unemployable due to his visual defects and lack of hand and eye coordination. An opthalmologist testified: "He can't drive a vehicle. He is really in danger of falling down and falling, bumping up against things. He doesn't know what is beside him. I think that if you employed—that anyone that would employ him is at great risk for having him sustain much more problems, accidents, while he is employed."

Defendants concede that severity of plaintiff's injuries by stating: "The plaintiff's loss of sight, smell, and mobility in this case cannot and should not be minimized." However, defendants also state: "Objectively, however, the plaintiff does have an intellect and can and does cross streets, use public transportation, and function by himself. He is partially disabled but has been employed and is employable. Objectively, the $943,129.93 awarded by the jury is nearly seven times the plaintiff's specials and lost wages for seven years and nearly five times the amount of those specials, lost wages, and Dr. Arbit's $70,000 seven-year program [for rehabilitation]. Objectively, that award is not reasonably supported by the evidence."

While the amount of compensatory damages was not subject to scientific computation, it was subject to the discerning eye and keen intellect of a commensal cross-section of the community who sat as jurors. In reaching their verdict, the jurors applied their intellectual perceptions to all the evidence in light of their own observations and experiences in the affairs of life. Plainly, reviewing court judges are not in as good a position as a jury to discern or evaluate evidence. Therefore, the observations and experiences in the affairs of life of re-

viewing court judges cannot take precedence over those of the jury when determining how much money is reasonable compensation for injuries and suffering. Thus, a jury's award should not be disturbed on review as excessive for particular injuries unless it is shocking to the judicial conscience. Moreover, the judicial conscience must evolve with changing times so that it is still not shocked by the amount of a verdict that was also shocking to the community in the past, but is now consistent with current societal mores and demands. (*Batteast v. Wyeth Laboratories, Inc.* (1988), 172 Ill. App. 3d 114, 141.) In the instant case, we cannot say that the amount of the jury's verdict for the injuries sustained is shocking to a judicial conscience with a present-day awareness. We therefore do not believe that the amount of the damages awarded by the jury should be disturbed.

Accordingly, the judgment of the circuit court is affirmed in all respects.

Affirmed.

WHITE, P.J., and McNAMARA, J., concur.