RODGER ALVIS *et al.*, Parents and Next Friends of Briana Li Alvis, a Minor, Plaintiffs-Appellees, v. HENDERSON OBSTETRICS, S.C., *et al.*, Defendants-Appellants (BroMenn Healthcare, Defendant and Cross-Plaintiff-Appellant; William P. Henderson *et al.*, Defendants and Cross-Defendants-Appellees).

Third District Nos. 3—90—0663, 3—90—0674 cons.

Opinion filed February 4, 1992.—Modified opinion filed May 15, 1992.

Livingston, Barger, Brandt & Schroeder, of Bloomington (Richard E. Stites, of counsel), for appellant BroMenn Healthcare.

Jerome Mirza & Associates, Ltd., of Bloomington (Jerome Mirza, of counsel), for appellees Rodger Alvis and Marsha Alvis.

Gary D. Nelson and Nicholas J. Bertschy, both of Heyl, Royster, Voelker & Allen, of Peoria, for Henderson Obstetrics, S.C., and William P. Henderson.

PRESIDING JUSTICE BARRY delivered the opinion of the court:

Briana Li Alvis, daughter of plaintiffs Rodger Alvis and Marsha Alvis, suffered severe injury to her kidneys at the time of her birth on November 15, 1983. This medical malpractice action was brought by plaintiffs against Dr. William P. Henderson, the obstetrician who delivered her, and BroMenn Healthcare, successor to Brokaw Hospital in Bloomington, where the delivery took place. Following a six-day jury trial, a verdict of $2,909,818.42 was returned in favor of plaintiffs, and on BroMenn's counterclaim against Dr. Henderson for contribution, the jury apportioned the verdict 75% against the doctor and 25% against the hospital. Judgment was entered on the verdicts. However, after considering post-trial motions, the trial court vacated judgment on the counterclaim.

Dr. Henderson appeals from the judgment against him in favor of plaintiffs. BroMenn appeals from the judgment in favor of plaintiffs and from the denial of its counterclaim against Dr. Henderson.

Dr. Henderson was the attending physician for the delivery of Marsha Alvis' first child born in 1981. Because the child was premature at birth, it had respiratory difficulties and had to be transferred to St. Francis Hospital in Peoria. When Marsha again became pregnant, she wanted to establish the correct due date. On the basis of her last menstrual period, Dr. Henderson said her due date was November 11, 1983, but a subsequent sonogram indicated a due date of December 25, 1983. A second sonogram also indicated a December 25 due date. Sonograms at that time were accurate within two to four weeks on either side of the predicted date.

Marsha testified that the second sonogram revealed the baby in a breech position (butt down) and that Dr. Henderson told her that he would deliver the baby by cesarean section if it was still breech three weeks before the December 25 due date.

Marsha was examined by Dr. Henderson twice on November 14 in his office. Both times he found her cervix to be thick and dilated two centimeters and the baby to be in a vertex position (head down). At 1:15 a.m. on November 15, Marsha was admitted to Brokaw Hospital with contractions about eight minutes apart. The admitting nurse, Cynthia (Murphy) Ptasnik, took her medical history, reviewed her pre-

natal record which was on file at the hospital, and performed a vaginal examination which she said indicated vertex presentation.

The nurse found the cervix to be dilated to three to four centimeters and to be effaced (thinned) about 60% to 70%. She called Dr. Henderson at 1:50 a.m. for orders and reported to him by telephone again at 6:30 a.m. before going off duty. During the night Marsha stopped feeling any contractions; however, a fetal monitor attached to her abdomen indicated that contractions were continuing and becoming more frequent. In the course of the telephone report at 6:30 a.m., Dr. Henderson ordered the administration of pitocin to augment labor so that the contractions would become more frequent and stronger.

After the shift change, Mary Kuerth was the registered nurse responsible for Marsha. At trial she testified that she had been uncertain as to the baby's position after her first vaginal examination at about 6:30 a.m., although she made no such notation in the patient's chart.

Dr. Henderson next examined Marsha in the hospital about 9 a.m., at which time he performed both Leopold's maneuvers (abdominal palpitation) and a vaginal exam and found the baby to be in a vertex position. He then ruptured the membranes of the mother's water bag.

Mary Kuerth administered the pitocin, performed nine vaginal examinations during the day, and reported Marsha's progress by telephone to Dr. Henderson at regular intervals. All of Mary's examinations were recorded as indicating vertex position. During the day the contractions became more frequent and cervical changes continued. About 2:35 p.m. Mary called Dr. Henderson to let him know that Marsha was making good progress and to find out how he could be reached when she was ready to deliver. According to Mary, cervical dilation had progressed by 2½ centimeters between 1 p.m. to 2:45 p.m. and was seven to eight centimeters at that time.

As Mary Kuerth's shift ended, Lynette Taylor came on duty and was assigned the care of Marsha Alvis. In doing her first vaginal examination at 2:55 p.m., she found the cervix fully dilated and the baby in a frank breech position (buttocks first). According to the fetal monitor, the baby's heart beat was decelerating. Dr. Henderson was called and arrived three minutes later. He found the baby's buttocks visible, determined that it was too late to perform a cesarean section, and proceeded with a vaginal delivery.

The baby's buttocks came first followed by legs and body up to the neck. The nurses who were present in the delivery room testified that Dr. Henderson had his hands around the baby's body with his

thumbs in the small of the back and his fingers gripping the abdomen and upper thighs. He pulled on the baby several times and rotated her to obtain various angles in an effort to deliver the head. The umbilical cord was visible around the baby's neck. The nurse assisting him asked three times whether he did not want to cut the cord, and after several minutes, the doctor did cut the cord and was then able to deliver the head. The baby was blue and not breathing. One of the nurses and Dr. Henderson began resuscitation on the baby, who soon began to breathe on her own.

Dr. Henderson testified at trial that after birth it was determined that the baby's gestational age was 35 to 36 weeks, but that he had believed her to be full term on November 14, 1983. He also stated that he now believes he probably erred as to the vertex presentation and that she was probably breech the entire day since a reversal of position in the uterus is rare. He further testified that he believed the mother to be in labor when he ordered the pitocin and when he ruptured her water bag, and that the determination of gestational age and onset of labor are the responsibility of the doctor, not the nurses. He based his conclusion that labor had begun from the contractions and the effacement and dilation of the cervix.

Plaintiff's key expert witness was Dr. Robert Kretzschmar of Iowa City, Iowa, who stated that in his opinion, the mother was not in labor before 11 a.m. on the morning of November 15. He also testified that it was his opinion that Dr. Henderson was negligent in ordering pitocin, in rupturing the mother's water bag, in failing to discover that the baby was in a breech position, and in using excessive pressure on soft tissues in the delivery.

Dr. James Zimmerman, a pediatrician who arrived in the delivery room shortly after birth, observed bruises on the baby's buttocks. He transferred her to St. Francis Hospital in Peoria because she was having respiratory problems. When the baby was three days old, a Peoria nephrologist, Dr. Philip J. Olsson, was called in because of her low urinary output. He saw a lot of bruising in her flank area and sacrum. Following an angiogram, he found her arteries open, but that extensive hemorrhaging had occurred in the flank area around the kidneys and under the capsula of the kidneys. As a result of clotted blood pressing on the kidney tissue, almost no blood was going into the kidneys. He attempted to drain blood to relieve the pressure, but obtained very little blood since it was no longer liquid. Extensive kidney damage had occurred.

At the time of trial, one kidney had been removed and the prognosis was that Briana would require a kidney transplant by the time

she is 12 or 15 years old which, if the donor is a relative, would last 10 to 15 years. A second transplant, this one from a cadaver, would be attempted but with a shorter time before failure would occur. A third transplant might be possible, depending on her condition. Dr. Olsson stated that she would not be "a normal healthy person" and would be a greater surgical risk each time as a result of the transplants. In addition, she would run a greater risk of developing malignant tumors and other health problems. By about age 45, when the third transplanted kidney would begin to fail, she would then have to receive weekly dialysis treatments in order to survive. Dialysis sessions would be three to four hours in length three times each week. One side effect of dialysis is acceleration of hardening of the arteries in the patient.

Dr. Olsson stated that he had never seen a newborn baby with such injuries, and that such trauma could not have been caused by a normal birth. He testified that, in addition to the bruises, she had some injury to the skin on her back which left a scar. It was not disputed that the kidney injury was the result of birth trauma.

At trial plaintiffs advanced four theories of negligence against Dr. Henderson: (1) wrongful prescription of pitocin for a patient not in active labor and with the baby preterm; (2) wrongful rupture of the membranes when the baby was preterm; (3) failure to diagnose the baby's breech position in time to perform a cesarean section delivery; and (4) application of undue pressure to the baby's soft tissues during delivery. Plaintiffs' theories of negligence against the hospital were (1) permitting pitocin to be administered to a patient who was not in active labor and who was preterm and (2) failure to detect the baby's breech position in time for the doctor to perform a cesarean delivery.

We will first examine the contentions of BroMenn and of Dr. Henderson concerning the negligence issues. Both defendants contend the verdict and judgment were contrary to the manifest weight of the evidence in that plaintiffs failed to establish violations of standards of care as to the alleged acts of negligence and, further, that the evidence failed to establish that any wrongful acts of defendants were the proximate cause of the baby's injuries.

■ When a jury considers several alternative grounds for a general verdict, a reviewing court can sustain the general verdict if any one of those grounds supports the general verdict and need not speculate as to which ground the jury found persuasive. (*Moore v. Jewel Tea Co.* (1970), 46 Ill. 2d 288, 263 N.E.2d 103; *Hany v. General Electric Co.* (1991), 221 Ill. App. 3d 390.) Thus, if there was sufficient evi-

dence under any one theory to support a finding of negligence by each defendant, then the judgment must be affirmed. We do so find.

■ As to BroMenn's liability, Dr. Henderson and Dr. Kretzschmar (plaintiff's expert medical witness) both testified that a competent obstetrical and delivery nurse should be able to determine whether the baby was in breech position prior to delivery and that the doctor would rely upon the nurse to make that determination and to report to him in a timely fashion. In addition, the obstetrical director at Brokaw Hospital at the time of this occurrence testified that the hospital had a written policy requiring that its labor and delivery nurses be able to determine the presenting part of the baby by doing a vaginal examination. She also testified that it was a responsibility of the nurse to determine whether the baby was breech or vertex.

Defendant BroMenn relies upon evidence indicating that it may be difficult to make that determination before the water bag has broken and while the cervix is dilated less than nine centimeters and argues that plaintiffs' evidence does not establish a standard of care for nurses in this matter. Clearly the witnesses did not all agree, and consequently, these issues involving credibility of the witnesses and weight to be given their testimony were for the jury to decide. (*Witherell v. Weimer* (1987), 118 Ill. 2d 321, 515 N.E.2d 68.) There was credible evidence of the standard of care to which labor and delivery nurses are held, *i.e.*, to assess correctly the position of the fetus prior to delivery, and there was substantial evidence that defendant's nurses violated that standard in this case. Plaintiffs' evidence was sufficient to support the verdict and judgment on that issue.

■ BroMenn also contends that plaintiffs failed to establish that the undetected breech position was the cause of the baby's injuries. However, Dr. Henderson testified that he preferred to deliver breech babies by cesarean section and that, had he known in time, he would have performed a cesarean section in this case. The fact that other witnesses testified that vaginal delivery of breech babies is perfectly safe and that cesarean delivery of a baby with a cord around the neck requires some maneuvering of the baby does not invalidate Dr. Henderson's statement. As one witness indicated, a baby delivered by cesarean does not encounter the hard pelvic bones of the mother but is lifted out through the soft tissue of the uterine and abdominal wall, thereby having less risk of injury. The evidence is quite strong that, had the breech presentation been detected by the doctor or the nurses even one-half hour earlier, the tragic injury to the baby would not have occurred.

BroMenn argues that the undetected breech position at most created a condition which increased the risk of injury, and therefore, that plaintiffs failed to prove that the conduct of the nurses was the proximate cause of the injury. It has been said, "Negligent conduct cannot be the proximate cause of an injury, unless there is evidence that but for the conduct, the injury would probably have not resulted." (*Kincl v. Hycel, Inc.* (1977), 56 Ill. App. 3d 772, 787-88, 372 N.E.2d 385, 396.) Obviously the failure to detect the breech was not the sole cause of injury here, but it was a proximate concurring cause which, in a natural and continuous sequence, unbroken by any independent cause, produced the injurious event and without which that event would not have occurred. (See 57A Am. Jur. 2d *Negligence* §471 (1989).) We believe the flow of events constituting the birthing process was a part of one natural and continuous sequence which produced the baby's injuries. The failure to determine the baby's breech position earlier led to the difficult vaginal delivery and was a proximate cause of the injury, though not the sole cause.

■ The next question is whether there was sufficient evidence of Dr. Henderson's negligence to support the verdict returned against him. In our view, the most persuasive evidence of Dr. Henderson's negligence was that relating to the application of undue pressure to the soft tissue of the baby during the delivery process.

Dr. Henderson argues that there was no eyewitness evidence that he applied excessive pressure in the soft tissue areas of the emerging baby to contradict his testimony that he had his hands on the bony parts of the baby. He offered, as an explanation of the injuries, that the baby could have been injured by the mother's pelvic bones as she passed through the birth canal.

Eyewitness testimony was not required here. The transcript of the trial discloses that plaintiffs' medical experts testified that, in their opinion and based upon the bruising present after delivery, Dr. Henderson used excessive pressure on the baby's soft tissues during the delivery. Dr. Olsson, the treating nephrologist, stated that he had never seen such severe injuries from a vaginal delivery. And the nurses present in the delivery room testified that Dr. Henderson pulled and twisted the baby's torso for several minutes trying to free her head. Thus, the evidence of Dr. Henderson's negligence in applying excessive pressure strongly supported the verdict against him.

The verdict in favor of plaintiffs and against both the hospital and the doctor was not contrary to the manifest weight of the evidence.

Defendant BroMenn next contends that the trial court erred in dismissing its counterclaim as violative of the four-year statute of re-

pose. The date of birth was November 15, 1983, and BroMenn's motion for leave to file a counterclaim was allowed on May 15, 1989. The jury's verdict apportioning damages 75% against Dr. Henderson and 25% against the hospital was returned on May 25, 1990. On July 3, 1990, the Illinois Supreme Court filed its decision in *Hayes v. Mercy Hospital & Medical Center* (1990), 136 Ill. 2d 450, 557 N.E.2d 873, barring third-party actions against a physician or other health care provider after the period of repose. The trial court here followed the *Hayes* decision in dismissing the counterclaim when it entered its decision on post-trial motions on August 20, 1990.

■ After *Hayes* the Illinois Supreme Court ruled in *Antunes v. Sookhakitch* (1992), 146 Ill. 2d 477, that, where the cause involves the claim of a minor plaintiff for medical malpractice, a third-party complaint for contribution may be filed within the eight-year period of repose applicable to the minor plaintiff. (Ill. Rev. Stat. 1989, ch. 110, par. 13—212(b).) Although *Antunes* involved a third-party complaint by a defendant in the underlying suit filed against two doctors not previously parties to the action, we are persuaded that the logic of the *Antunes* decision compels application of the same rule here, where the contribution action is a counterclaim by one defendant against another.

The court in *Antunes* observed:

"[A]llowing the filing of [defendant's] third-party actions within the same period of repose as the minor's underlying complaint does not have the effect of lengthening the period of potential liability of [third-party defendants] or their insurers." (146 Ill. 2d at 491.)

The same, of course, is true as to codefendants whose period of potential liability to a minor plaintiff is not extended by allowing a complaint for contribution between them to be filed within the same period of repose. To hold otherwise would deny a right to contribution in those cases where a minor plaintiff did not commence a medical malpractice action until after the four-year statute of repose (Ill. Rev. Stat. 1989, ch. 110, par. 13—212(a)) had expired, a result which the *Antunes* decision describes as an "absurdity and injustice." 146 Ill. 2d at 488.

Defendant Henderson argues here that, unlike the facts in *Antunes*, where the third-party complaint was filed only 10 weeks after the third-party plaintiff was named a defendant in the underlying cause, BroMenn did not seek leave to file its counterclaim until 4½ years after the complaint was filed. Henderson suggests that BroMenn's lack of reasonable diligence is a basis for distinguishing this

case from *Antunes*. We cannot agree. Nothing in the *Antunes* decision purports to establish a reasonable diligence standard in addition to the statute of repose, and we decline to do so here. BroMenn brought its action for contribution within the eight-year statute of repose established by the legislature for medical malpractice actions by minors and recognized by the supreme court of Illinois in *Antunes* as applicable to counterclaims for contribution. That is sufficient to require a reinstatement of the judgment entered on the counterclaim in the trial court.

Therefore, we reverse the orders of the trial court which dismissed BroMenn's contribution counterclaim and granted Henderson judgment notwithstanding the verdict. We reinstate BroMenn's judgment against Henderson as originally entered on the verdict.

We next consider that both defendants, BroMenn and Dr. Henderson, contend that the trial court erred in instructing the jury that damages included the loss of future earnings as one element. Defendants argue that evidence was lacking of any impairment of Briana's earning capacity or a reduction in her ability to perform work and that the $300,000 awarded by the jury for loss of future earnings was speculative and improper. They insist that *Brown v. Chicago & North Western Transportation Co.* (1987), 162 Ill. App. 3d 926, a case involving an adult plaintiff suing his employer for a back injury, should control here. We have no quarrel with *Brown*. In a case where the plaintiff is an employed adult, we agree that specific evidence of reduced ability to perform work would be required.

■ The instant case, however, is governed by those decisions involving a permanent injury to a minor child. In *Hartseil v. Calligan* (1976), 40 Ill. App. 3d 1067, 353 N.E.2d 10, where a 16-year-old plaintiff had suffered a back injury which left him with a permanent residual deformity of the spine, the trial court's failure to instruct the jury concerning loss of future earnings was reversed. The applicable rule was stated:

> "In Illinois the trier of fact may infer a future loss of earnings from the nature of an injury, and courts have permitted an instruction to that effect where evidence is adduced of some permanent injury to a minor child." 40 Ill. App. 3d at 1069, 353 N.E.2d at 12.

Accord *Redmond v. Huppertz* (1966), 71 Ill. App. 2d 254, 217 N.E.2d 85.

Here the evidence is uncontradicted that Briana has suffered severe permanent injuries and that she will never be a normal healthy

person. The jury could properly infer a future loss of earnings from the nature of her injury, and the instruction given was not error.

The final issue raised by defendants concerns the trial court's refusal to allow evidence that medicare benefits would provide payment or reimbursement for 80% of the cost of future kidney treatment and dialysis. The jury found future medical expenses of $688,000. Defendants rely upon *Peterson v. Lou Bachrodt Chevrolet Co.* (1979), 76 Ill. 2d 353, 392 N.E.2d 1, where the court held that the plaintiff could not recover the value of free services which had been provided by Shriners' Hospital for Crippled Children since the plaintiff had incurred no expense or liability for those services. The *Peterson* court declined to extend the collateral source rule prohibiting evidence of insurance indemnification as a reduction of damages to a case where plaintiff made no contribution or premium for the charitable benefits received.

*Peterson* has been distinguished in a case where defendants sought to introduce evidence of the availability of free governmental services for handicapped children. In *Northern Trust Co. v. County of Cook* (1985), 135 Ill. App. 3d 329, 333-34, 481 N.E.2d 957, the court stated:

"Although Illinois law generally prohibits a plaintiff from recovering for 'the value of services that he has obtained without expense, obligation, or liability' (*Peterson v. Lou Bachrodt Chevrolet Co.* (1979), 76 Ill. 2d 353, 362, 392 N.E.2d 1), the trial court here refused to allow the jury to consider the free governmental services due to the uncertainty of their availability in the future. We find no error in the trial court's decision. In *Peterson*, the plaintiff had already completed charitable surgical services prior to seeking compensation for the same services from the tortfeasor. The *Peterson* court did not decide the issue of reducing a defendant's liability for future care because of the current availability of charitable and public welfare programs. In *Peterson*, the charitable assistance had already been received. In the instant case, however, the availability and level of future free services is a matter of speculation."

█▌ In the case before us, as in *Northern Trust*, the evidence defendants sought to present concerned the availability of governmental payments for future medical expenses. This court has previously held that such evidence is not admissible. (*Phelan v. Santelli* (1975), 30 Ill. App. 3d 657, 334 N.E.2d 391.) The availability and level of such payments for organ transplants and dialysis treatments at the future

times predicted here is obviously speculative and hence was properly excluded by the trial court.

For the reasons stated, we reverse the orders of the trial court setting aside the judgment on the counterclaim in favor of BroMenn, and we affirm the judgment as entered on the verdict. We also affirm the plaintiffs' judgment against all of the defendants.

Affirmed in part; reversed in part.

SLATER and HAASE, JJ., concur.