PAIGE PRESTON, a Minor by Her Mother and Next Friend, Patricia Preston, Plaintiff-Appellee, v. GAYLE SIMMONS *et al.*, Defendants-Appellants.

First District (1st Division)   No. 1—98—4451

Opinion filed March 30, 2001.

Cassiday, Schade & Gloor, of Chicago (Timothy J. Ashe, Donald F. Ivansek, and Morgan M. Strand, of counsel), for appellants.

Michael W. Rathsack, of Chicago (Richard F. Mallen, Scott B. Wolfman, and Michael W. Rathsack, of counsel), for appellee.

JUSTICE TULLY delivered the opinion of the court:

This case concerns an action for medical malpractice brought by a minor plaintiff, Paige Preston, against defendants Dr. Gayle Simmons, Dr. Mary Horan, and St. Joseph Hospital, for injuries plaintiff suffered at the time of her birth. The jury returned a verdict in plaintiff's favor and awarded damages in the amount of $1,010,000. Defendants thereafter filed a posttrial motion, seeking a new trial or judgment notwithstanding the verdict, which the trial court denied. Defendants now appeal from that order, arguing a new trial is or judgment notwithstanding the verdict is warranted because: (1) the trial court improperly coerced the jury into rendering a verdict when the jury was deadlocked; (2) the trial court allowed the use of prejudicial demonstrative evidence; (3) plaintiff's counsel violated motions *in limine* barring certain evidence; (4) plaintiff's counsel improperly cross-examined defendants' medical expert; (5) the trial court improperly circumscribed defendants' cross-examination of plaintiff's witness; (6) plaintiff's counsel engaged in improper closing argument; (7) the trial court issued instructions on damages not supported by any evidence; (8) the jury awarded excessive damages; and (9) the verdict was against the manifest weight of the evidence. This court has jurisdiction pursuant to Supreme Court Rules 301 and 303 (155 Ill. 2d Rs. 301, 303). For the reasons set forth below, we reverse and remand for a new trial.

## Background

On May 15, 1991, Patricia Preston gave birth to plaintiff at St. Joseph Hospital. In the course of delivery, plaintiff's shoulder became impacted under Mrs. Preston's pelvic bone, a condition known as shoulder dystocia. Shoulder dystocia is a potentially emergent condition because the infant may be deprived of oxygen until the shoulder is released and the infant is delivered. Defendants, Dr. Gayle Simmons (Dr. Simmons), a board-certified obstetrician and gynecologist, and Dr. Mary Horan (Dr. Horan), a first-year obstetrics and gynecology resident, were in attendance during Mrs. Preston's labor and utilized several techniques to try to release plaintiff's shoulder. After several attempts, plaintiff was released and delivered, but she suffered an injury

to the nerves in her left arm and shoulder, known as a brachial plexus nerve injury, permanently depriving her of some use of her left arm. Plaintiff thereafter brought a medical malpractice action alleging Dr. Simmons failed to properly supervise Dr. Horan, and Dr. Simmons and Dr. Horan failed to use the proper techniques when delivering plaintiff, thereby causing her injury. A jury trial commenced on March 24, 1998.

Dr. Simmons testified at trial that she had seven years' experience in labor, delivery and performing shoulder dystocia maneuvers, had trained residents to perform these maneuvers during her tenure as St. Joseph's assistant medical director, and had trained Dr. Horan in shoulder dystocia maneuvers and performed 50 deliveries with Dr. Horan prior to plaintiff's delivery. Dr. Simmons stated that when Mrs. Preston arrived at St. Joseph Hospital, she and Dr. Horan examined her to determine her stage of labor. At 11:30 a.m., Mrs. Preston was completely dilated and Dr. Simmons and Dr. Horan began the delivery of plaintiff. Mrs. Preston lay supine on a delivery bed, Dr. Simmons and Dr. Horan stood between her legs, guiding plaintiff's head down the birth canal, and Elmer Preston, plaintiff's father and Mrs. Preston's husband, stood on the right side of Mrs. Preston. At 11:37 a.m., plaintiff's head was delivered and Dr. Simmons suctioned plaintiff's mouth and nostrils to remove fetal stool and amniotic fluid. Dr. Horan felt for the umbilical cord and informed Dr. Simmons that it was wound tightly around plaintiff's neck. Dr. Simmons cut the cord and placed her hands over Dr. Horan's hands to correctly position them for delivery. Dr. Horan attempted to deliver plaintiff, applying gentle downward traction, but discovered plaintiff's shoulder was impacted. When Dr. Horan alerted Dr. Simmons to this fact, Dr. Simmons pushed Mrs. Preston's left leg back, applied suprapubic pressure, and told Dr. Horan to attempt delivery again. Dr. Simmons represented that in shoulder dystocia cases, suprapubic pressure is an appropriate procedure to dislodge an impacted shoulder, while progressively more invasive procedures are used if the shoulder cannot be freed. Dr. Horan tried gentle downward traction again, but plaintiff's shoulder remained impacted. When informed of this, Dr. Simmons called over two nurses to help perform a McRoberts maneuver. A McRoberts maneuver involves hyper-flexing both of the mother's legs, while applying suprapubic pressure to the mother and gentle downward traction to the infant. The maneuver facilitates delivery by flattening the mother's backbone and rotating the pelvic bone, creating a larger opening for the infant to be delivered through. Two nurses held both of Mrs. Preston's legs back, while Dr. Simmons applied suprapubic pressure, and Dr. Horan applied gentle downward traction to plaintiff. Plaintiff was delivered easily at 11:40 a.m., but in the process of

delivery, the nerves in her left shoulder and arm were stretched, resulting in a brachial plexus nerve injury. In Dr. Simmons' opinion, plaintiff's injury was caused by the impaction of her shoulder under Mrs. Preston's pelvic bone, and Dr. Horan acted within the normal scope of expertise as a first-year resident in aiding in plaintiff's delivery.

Dr. Horan testified that she was a board-certified obstetrician and gynecologist, but at the time of plaintiff's delivery, she was in the tenth month of her first year of a four-year residency in obstetrics and gynecology. In her first year of residency, Dr. Horan performed roughly 270 deliveries, supervised by an attending physician, was trained in shoulder dystocia maneuvers, and was present during four to five shoulder dystocia deliveries, prior to plaintiff's delivery. Dr. Horan agreed that too much traction could cause a brachial plexus injury by stretching the nerves in an infant's neck and shoulders. Dr. Horan could not quantify in pounds the amount of force she used in delivering plaintiff because the proper amount of traction could only be measured by feel. Dr. Horan stated that the amount of traction used on an infant during delivery does not vary according to whether a delivery is normal or whether a shoulder dystocia delivery is indicated, because gentle downward traction is the only appropriate force. Dr. Horan testified that she used gentle downward traction at all times when attempting to deliver plaintiff.

Elmer Preston testified on behalf of plaintiff at trial. Prior to examination of Mr. Preston, the court granted plaintiff's motion *in limine*, over defendants' objection, to bar cross-examination of Mr. Pres-
ton concerning his estrangement from Mrs. Preston and the fact that he lived with another woman outside Illinois, so long as the direct testimony did not invite inquiry into these issues.

Mr. Preston testified that when plaintiff's delivery began, he stood on the right side of Mrs. Preston, while Dr. Horan and Dr. Simmons stood between Mrs. Preston's legs. When plaintiff's head was delivered, Dr. Horan stated that the umbilical cord was around plaintiff's neck, at which point the doctors cut the umbilical cord and suctioned plaintiff. After the cord was cut, Dr. Horan began pulling on plaintiff's head, while Dr. Simmons pushed Mrs. Preston's leg back, but did not apply pressure to Mrs. Preston's abdominal or pubic area. Dr. Horan continued to pull on plaintiff's head, harder and harder, and at one point, put her leg up on the side of the bed to gain greater leverage when pulling on plaintiff's head. Mr. Preston told the doctors to go easy, but they ignored him. Some time later, Dr. Simmons and a nurse pulled both of Mrs. Preston's legs back, and plaintiff was delivered

easily. Mr. Preston testified that he had an opportunity to observe plaintiff over the years at various times, and that a videotape and photographs shown at trial accurately depicted plaintiff's disabilities and disfigurement.

Mrs. Preston testified that at the time of plaintiff's delivery, Dr. Simmons and Dr. Horan stood between her legs, while Mr. Preston stood on her right side. After the doctors told Mrs. Preston to push for the second time, plaintiff's head was delivered. The doctors then told Mrs. Preston to stop pushing, and one of them said that the cord was around plaintiff's neck. From her position, Mrs. Preston could not see the doctor's hands, but she could see the upper part of their bodies and shoulders. After the cord was cut and plaintiff was suctioned, the doctors told Mrs. Preston to push again. At some point, someone said that plaintiff's shoulder was stuck, and the doctors again told Mrs. Preston to stop pushing. Dr. Simmons pushed Mrs. Preston's left leg back toward her chest, while Dr. Horan tried again to deliver plaintiff. Dr. Simmons did not apply pressure to Mrs. Preston's abdominal or pelvic area at any time during the delivery. Mrs. Preston asked the doctors if her husband could help, but they did not respond to her. Dr. Horan applied gentle pressure when first attempting to deliver plaintiff, but her movements became more vigorous and rapid after plaintiff's shoulder became stuck. At one point, Mrs. Preston heard Mr. Preston say, "Easy, easy, you're hurting the baby." Eventually, one of the nurses came to Mrs. Preston's left side and joined Dr. Simmons in pressing on Mrs. Preston's left leg. Mrs. Preston was uncomfortable with one leg pushed back, so she pulled her right leg back on her own, at which point, plaintiff delivered easily.

Dr. John Long, a board-certified obstetrician and gynecologist, testified on behalf of plaintiff. Dr. Long stated that Dr. Simmons breached the standard of care by pushing back only one leg when attempting to release plaintiff's impacted shoulder. Dr. Long stated that pushing back one leg compounds the problem in a shoulder dystocia case because this action does not raise the mother's pelvic bone, and instead tilts the pelvic bone, creating a kink in the birth canal and a smaller opening for the infant to be delivered through. Dr. Long represented that although pushing one leg back does not harm an infant, it hinders the delivery process. Dr. Long testified that a proper McRoberts maneuver, by contrast, which involves pushing both legs back to the chest and applying suprapubic pressure, facilitates delivery by changing the angle of the birth canal and the pelvic bone. Dr. Long stated that Dr. Simmons deviated from the standard of care by allowing Dr. Horan, a first-year resident, to perform the most difficult part of delivery in an emergency situation, and Dr. Horan, in turn, deviated

from the standard of care by applying too much traction when attempting to deliver plaintiff. In Dr. Long's opinion, too much traction was most likely the cause of plaintiff's brachial plexus injury.

At the prompting of plaintiff's counsel, Dr. Long stated that he had examined the mechanics of a human skeletal model and that the use of that model would help him to explain his testimony. Using the skeletal model, Dr. Long demonstrated what happens to the pelvic bone when one leg is pushed back. Defense counsel objected to the demonstration on the basis that the skeletal model distorted the movements of the pelvis because the model's legs were affixed with rubber ligaments on only one side, the spine was fixed to the pelvic region with screws, and the skeleton was of male rather than female, but the trial court allowed the demonstration. On cross-examination, Dr. Long admitted that the skeleton model used in his demonstration was probably of a male skeleton, because a woman's pelvis is rounder. Dr. Long also stated that, unlike the model, an actual woman would have ligaments on both legs, and her spine would move when her leg was pushed back.

Dr. Michael Hughey, a board-certified obstetrician and gynecologist, testified on behalf of defendant. Dr. Hughey stated Dr. Simmons complied with the standard of care when delivering plaintiff because pushing one leg back and applying suprapubic pressure was an appropriate way to treat shoulder dystocia, separate and apart from the McRoberts maneuver. Dr. Hughey stated that Dr. Horan was qualified to participate to the extent she did in plaintiff's delivery, and that her application of mild to moderate downward traction, as she described, also conformed to the standard of care. Dr. Hughey testified that a brachial plexus injury may occur in a shoulder dystocia delivery, in the absence of any negligence, because maternal pushing and delivery maneuvers, even properly performed, may stretch the brachial plexus nerves. In Dr. Hughey's opinion, plaintiff's injury occurred while she was coming through the birth canal.

On cross-examination, plaintiff's counsel questioned Dr. Hughey concerning representations he made at the time of his deposition regarding the location of an instructional video on shoulder dystocia. The videotape itself was never introduced at trial and its location was not at issue. Defense counsel objected to this cross-examination on the basis it was irrelevant and the issue of the tape's location entirely collateral. The trial court overruled the objection, finding Dr. Hughey's deposition answers had bearing upon his candor and credibility as a witness.

On cross-examination, plaintiff's counsel also asked Dr. Hughey if he had ever been represented by defense counsel's law firm, to which

Dr. Hughey replied he had not. Plaintiff's counsel produced a notice of filing from a 1988 case, Caftori v. Hughey, showing that defense counsel's law firm filed an appearance on behalf of Dr. Hughey. When asked by plaintiff's counsel if the notice of filing was false, Dr. Hughey responded he had no knowledge of having been represented by defense counsel's firm in the past. In a sidebar conference, defense counsel objected to this line of questioning on the basis that neither Dr. Hughey nor defense counsel had any knowledge of the prior representation in the Caftori lawsuit, and plaintiff's counsel had failed to properly disclose this as a basis for impeachment prior to trial. After further investigation, the court determined that Dr. Hughey's insurance carrier had retained defense counsel's firm to file an appearance on behalf of Dr. Hughey, but it did not appear that Dr. Hughey ever had any contact with the firm, because the matter was settled and dismissed. The trial court ultimately overruled defense counsel's objection to the impeachment, but instructed the jury not to infer anything negative about defense counsel's firm from the evidence.

Dr. Alan Free, plaintiff's pediatrician, testified concerning the extent of plaintiff's injury. Dr. Free stated that after diagnosing plaintiff's brachial plexus injury, he advised that she be enrolled in physical therapy. In the first six to nine months of therapy, plaintiff experienced good improvement, but she reached a permanent plateau thereafter. Plaintiff had regained good strength in her lower arm, such that from her elbow down she was essentially normal. However, plaintiff still could not fully extend her arm from the elbow, her upper arm and shoulder continued to display marked weakness, and there was some disproportion between her left arm and her right arm because of the lack of muscle development in the left. Dr. Free believed that occupational therapy would be appropriate for plaintiff in the future.

Dr. Norris Carroll, a pediatric orthopedic physician, estimated that plaintiff had recovered roughly 75% from her original brachial plexus injury. Dr. Norris stated that although plaintiff's left arm would never be normal, it would serve as a good assist limb in daily living. Dr. Norris stated that plaintiff remained unable to lift her left arm over her head, could move her left arm away from her side to a 30 degree angle, and her left arm was shorter than her right arm, a discrepancy that would become more apparent as she aged. Dr. Carroll stated that although plaintiff would experience continuing functional impairment, she would be able to hold employment, with some occupational limitations. In Dr. Carroll's opinion, surgery was not appropriate to treat plaintiff's condition.

Dr. Robert Eilers, a board-certified physical rehabilitation physi-

cian, testified that plaintiff's nerve damage was a static, permanent injury. Dr. Eilers agreed with Dr. Carroll's rough estimate of a 75% recovery and that surgery, while an option, was not recommended in plaintiff's case. Dr. Eilers stated that plaintiff would remain unable to bear weight with her left arm, could experience lower back strain in the future, and would always exhibit asymmetry between her left and right shoulders. Dr. Eilers stated that plaintiff's fine motor coordination was normal, and she would be able to drive, use a keyboard or play piano with adaptations, although sports and activities involving balance or throwing overhead would be challenging. Dr. Eilers represented that plaintiff would have to continue to develop compensation techniques to deal with her left arm's deficits, and additional physical therapy would be appropriate in the future.

On Friday, April 3, 1998, jury instructions were tendered to the jury. Over defense counsel's objection, the trial court instructed the jury that it could award plaintiff damages for "the present cash value of earnings reasonably certain to be lost in the future." At 2:08 the jury began deliberations, which lasted until 8:15 p.m. that day. On Monday, April 6, at 10:15 a.m., the jury reconvened for deliberations. At 12:15 p.m., the jury foreman informed the trial judge that the jury could not reach an agreement. The trial judge informed counsel for both parties of the deadlock and stated his intention to issue Illinois Pattern Jury Instructions, Civil, No. 1.05 (3d ed. 1995) (hereinafter IPI Civil 3d No. 1.05 ) as a deadlock jury instruction, as well as additional comments concerning the repercussions of a deadlock. Defense counsel objected to any instructions or comments beyond IPI Civil 3d No. 1.05 because the case was close. Over objection, the trial judge issued the following remarks to the jury:

"I have this instruction that I'm going to give you and then I'm going to require that you return to the jury room and continue your deliberations. And before I give that instruction I'm going to tell you that in roughly 14 years that I have sat as a judge presiding over jury trials I have had one other occasion in which a jury was not capable of reaching a unanimous verdict, that's referred to as a hung jury. The result of that is of course that you start all over again, pick a new jury and present all of your evidence once again. That is a very expensive undertaking to both sides [in] a contested lawsuit. It involves taking up the jury time of 12 other citizens and the Court's time instead of hearing another case that has not yet had its opportunity to be here.

And in that one instance, let me tell you that the second jury reached a verdict and I did not perceive any variance in the evidence that was presented the second time from that which was presented the first time. And I asked myself what was the differ-

ence, and the only difference that I could understand because I was not part of the deliberations was that the second jury was able to take the same facts, filter it and make a determination of how the case should be decided.

I'm very pleased with the composition of this jury. I believe that each one of you is an intelligent, fair-minded, honest human being who chooses to do the right thing. I'm not saying this to you so that you feel badly or that you question your own integrity or honesty nor am I attempting to influence your determination because if in fact you cannot reach a verdict then that is the law and that's what we'll live with and another jury will hear the case. If these cases were easy, we wouldn't need you."

After issuing these remarks, the trial judge issued IPI Civil 3d No. 1.05, as follows:

"This is an instruction which the Court gives to you which you are to consider together with all the other instructions that the Court previously has provided to you.

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree to it and your verdict must be unanimous. It is your duty as jurors to consult with one another and deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest conviction as to the weight or affect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. You are not partisans, you are judges, judges of the facts, and your sole interest is to ascertain the truth from the evidence in the case. Bless all of you. I ask that you now please return to the jury room and continue your deliberations."

After the deadlock instructions were given, the jury deliberated for three more hours. At 3:05 p.m., the jury returned a verdict in favor of plaintiff. Defendants thereafter filed a posttrial motion, attaching the affidavits of six jurors, who represented that they felt coerced into returning a verdict by the judge's comments. The trial court struck the affidavits as an improper means of impeaching the verdict and denied the posttrial motion. This appeal followed.

## Discussion

Defendants first contend that the trial court's instructions on the issue of deadlock were coercive and prejudicial. In conjunction, defendants maintain the trial court erred in failing to consider the af-

fidavits of the jurors concerning the coercive impact the instructions had on the process of reaching a verdict.

■ As a preliminary issue, we find no error in the trial court's determination to strike the jurors' affidavits impeaching the verdict. The affidavits of jurors cannot be used to show that the jury misunderstood the instructions or the law. *Chalmers v. City of Chicago*, 88 Ill. 2d 532, 539 (1982). Accordingly, we grant no consideration to these affidavits in resolving this issue and look solely to the language of the instruction itself and surrounding circumstances to determine if there was error.

■ When a jury communicates to the court its inability to reach a unanimous verdict, the court may, in its discretion, proffer some guidance, including the giving of a supplemental instruction. *People v. Lee*, 303 Ill. App. 3d 356, 363 (1999). In *People v. Prim*, 53 Ill. 2d 62 (1972), the Illinois Supreme Court set forth language to be used when instructing a deadlocked jury, and IPI Civil 3d No. 1.05 directly adopts the language endorsed by the court there. Defendants' claim of error is not directed to the giving of IPI Civil 3d No. 1.05, however, but to the court's supplemental, non-IPI deadlock instructions. Nevertheless, we must examine the court's supplemental instructions together with IPI Civil 3d No. 1.05, to determine if the instructions as a whole resulted in prejudice. *Paz v. Commonwealth Edison*, 314 Ill. App. 3d 591, 601 (2000) (jury instructions must be considered as whole to determine if prejudice resulted to the complaining party).

■ Generally, amplification or clarification of IPI instructions is permitted, but only in limited circumstances, where an IPI instruction is inadequate and an additional instruction is appropriate. *Podoba v. Pyramid Electric, Inc.*, 281 Ill. App. 3d 545, 552 (1996), citing *Lay v. Knapp*, 93 Ill. App. 3d 855, 857-58 (1981). Where an IPI instruction is adequate to charge the jury, the use of a non-IPI instruction is considered improper. *Hilst v. General Motors Corp.*, 305 Ill. App. 3d 792, 797 (1999). If a court determines an IPI instruction is inadequate, Illinois Supreme Court Rule 239(a) (177 Ill. 2d R. 239(a)) dictates that the instruction fashioned by the court be "simple, brief, impartial, and free from argument." Similarly, if a court determines to fashion an instruction specifically to instruct a deadlocked jury, the instruction must be "simple, neutral, and not coercive." *People v. Gregory*, 184 Ill. App. 3d 676, 681 (1989). In reviewing the propriety of a supplemental deadlock instruction, the test is whether, under the totality of circumstances, the language used actually coerced or interfered with the deliberations of the jury to the prejudice of the defendant. *People v. Branch*, 123 Ill. App. 3d 245, 250-51 (1984).

■ In this case, we agree it was improper for the trial court to is-

sue the supplemental deadlock instructions. IPI Civil 3d No. 1.05 by itself was adequate to charge the jury with the importance of pursuing an agreement, and no further instructions were necessary or appropriate. Considering the deadlock instructions as a whole in the context of this case, we believe the instructions also had the effect of impermissibly pressuring the jury to return a verdict. Although the jurors were instructed not to surrender their honest convictions, pursuant to IPI Civil 3d No. 1.05, and although trial judge pointedly advised the jurors he was not attempting to influence them and would "live with" their failure to reach a verdict, other comments made by the judge sent a very different message. To begin, we find the judge's emphasis on the time and expense invested by the parties and the judiciary laid undue stress on economic factors and the importance of returning a verdict. In addition, the judge's intimation that a failure to reach a verdict would deprive another case of the "opportunity" to be heard may well have led the jurors to believe it was their duty to return a verdict. The judge additionally commented that in his 14 years as a judge, he had only experienced one hung jury, and in his opinion, the only difference between the first trial and the second was that the second jury was able to "take the same facts, filter it and make a determination." Following this, the judge praised the jurors, stating he believed each of them to be an "intelligent, fair-minded, honest human being who chooses to do the right thing." The problem with these comments is that the jurors may have been left with the impression that a failure to return a verdict would prove the judge's appraisal of their intelligence and integrity wrong. In addition, the judge's disclosure regarding the rarity of hung juries, in his experience, may have impressed upon the jurors that a hung jury represented an aberration of the justice system. Considered collectively, we find the instructions worked to the prejudice of defendants and constitute reversible error.

In reaching this determination, we are cognizant that after the deadlock instructions were issued, the jury deliberated three more hours, a not insubstantial amount of time. However, although the length of time it took a jury to return its verdict after a supplemental instruction was given is a factor to be considered (*Palanti v. Dillon Enterprises, Ltd.*, 303 Ill. App. 3d 58, 61 (1999)), this factor alone is not determinative of whether coercion occurred. *Gregory*, 184 Ill. App. 3d at 682. Because it is extremely difficult for a reviewing court to determine a jury's subjective thoughts, the test of whether instructions are prejudicial ultimately must turn on whether the instruction imposed such confusion or pressure on the jury to reach a verdict that the accuracy of its verdict becomes uncertain. *Gregory*, 184 Ill. App. 3d at 681-82; *People v. Pankey*, 58 Ill. App. 3d 924, 927 (1978). In cases,

like the present one, however, where the question of liability is sufficiently close that a jury might reasonably return a verdict for either party, it is of even greater import that the trial be conducted in such a manner as not to improperly influence the jury. *Boasiako v. Checker Taxi Co.*, 140 Ill. App. 3d 210, 214 (1986). Here, the deadlock instructions, at best, served to confuse the jurors and interfere with their deliberations; at worst, they served to pressure the jurors to yield their individual convictions for the sake of a verdict. Under either scenario, the integrity of the verdict is necessarily impugned, such that a new trial is warranted.[1]

Because we are reversing this matter and remanding for a new trial, we will address only the issues remaining which are likely to reoccur in a new trial.

■ Defendants also contend it was improper to allow the use of the skeletal model, in conjunction with Dr. Long's testimony, to demonstrate the effect of pushing one leg back on the rotation of the pelvic bone. Defendants maintain that certain of the model's characteristics, specifically, the model's male gender, the absence of rubber ligaments on one of the model's legs, and the attachment of the model's pelvic area to its spine by screws, rendered it so grossly distorted and inaccurate that its use as demonstrative evidence was *per se* error.

It is within the trial court's discretion to determine whether a party may present demonstrative evidence to clarify an expert's testimony, and a reviewing court will not disturb that determination absent a clear abuse of discretion. *Schuler v. Mid-Central Cardiology*, 313 Ill. App. 3d 326, 337 (2000). Although demonstrative evidence has no probative value in itself, courts look favorably upon its use because it can help the jury to comprehend the verbal testimony of witnesses and understand the issues raised at trial. *Schuler*, 313 Ill. App. 3d at 337. The primary considerations in determining whether demonstrative evidence should be allowed are relevancy and fairness. *Hernandez v. Schittek*, 305 Ill. App. 3d 925, 931 (1999). Only where demonstrative evidence is inaccurate or tends to mislead the jury will its admission constitute an abuse of discretion. *Hernandez*, 305 Ill. App. 3d at 932.

Having reviewed Dr. Long's testimony in relation to the skeletal model, we find the trial court did not abuse its discretion in allowing

---

[1]We do not suggest that the trial judge intended to coerce the jury when issuing these supplemental instructions. The trial had gone on two weeks, and the judge clearly recognized it was in the best interests of all concerned that a verdict be returned, if possible. However, a verdict hastened by a judge, however worthy the motive, cannot be the result of that deliberation which the law guarantees. *Gregory*, 184 Ill. App. 3d at 681.

the model to be used for demonstrative purposes. Despite the differences pointed out by defendants between the skeletal model and an actual skeleton, the model does not appear to have been so substantially different in relevant characteristics to render its use *per se* error. Any distinctions between the model and an actual skeleton arguably impacted upon the weight of the demonstration, not its admissibility. Moreover, defendants were free to explore the significance of any distinctions during the cross-examination of Dr. Long.

However, although we find no error in permitting the use of this model in demonstration, we agree with defendants that a clearer foundation should have been laid before the model was introduced. For a party to introduce demonstrative evidence, a foundation must be laid by a person having personal knowledge of the object that the object is an accurate portrayal of what it purports to show. *Webb v. Angell*, 155 Ill. App. 3d 848, 861 (1987). Here, Dr. Long testified that he had examined the skeletal model and believed it would be useful to explain his testimony, but he omitted to testify as to the accuracy of the model's depiction of the movements of a human pelvis or, specifically, a female pelvis. Should the skeletal model be introduced in a new trial, this discrepancy in the foundation testimony should be rectified.

Defendants also maintain the trial court erred in allowing plaintiff to cross-examine Dr. Hughey concerning representations he made at his deposition regarding the whereabouts of an instructional videotape.

The record indicates that, at the time of his deposition, Dr. Hughey was asked by plaintiff's counsel if he had with him a copy of an instructional videotape on shoulder dystocia, which tape was at issue at that point in discovery but was no longer at issue at the trial. Dr. Hughey responded that he did not have the tape with him, although he apparently had given a copy of the tape to defense counsel at the deposition. At trial, plaintiff's counsel attempted to cross-examine Dr. Hughey on his failure to respond fully to the inquiry into the tape's location at his deposition. Defense counsel objected to the cross-examination on the basis that the tape's whereabouts was irrelevant and collateral. The trial court overruled the objection, however, finding Dr. Hughey's failure to give a complete and forthcoming answer to the deposition question reflected on his candor as a witness.

■ The scope of cross-examination rests within the broad discretion of the trial court. *Tsoukas v. Lapid*, 315 Ill. App. 3d 372, 380 (2000). One of the purposes of cross-examination is to test the credibility of the witness. *McDonnell v. McPartlin*, 192 Ill. 2d 505, 533 (2000). Subject to the trial court's discretion in determining the relative value for such purpose, it is proper to allow inquiry into collateral

matters revealing the past conduct of a witness which tend to impeach the witness' credibility. See *Poole v. University of Chicago*, 186 Ill. App. 3d 554, 561 (1989). Thus, matters tending to show an interest, bias or motive to testify falsely of a witness may be brought out on cross-examination, even if those matters were not brought out on direct examination. *Batteast v. Wyeth Laboratories, Inc.*, 172 Ill. App. 3d 114, 136 (1988). However, for deposition testimony to be admissible for impeachment, that testimony must contradict an in-court statement of the witness on a material matter. *Iser v. Copley Memorial Hospital*, 288 Ill. App. 3d 408, 413 (1997).

■ In this case, Dr. Hughey never referred to the instructional videotape in his direct testimony, and the videotape itself, its location, contents, and existence were never at issue, as the tape was not in evidence. Although plaintiff contends Dr. Hughey's responses had a bearing upon his interest, bias and motive to testify falsely, we fail to see this relationship. Even assuming Dr. Hughey's deposition responses concerning the tape's location had some bearing upon his credibility, the probative value of this evidence was outweighed by its potential for confusing and proliferating the issues. Under the circumstances presented, Dr. Hughey's deposition testimony was not admissible for impeachment.

■ Defendants also maintain the trial court erred in prohibiting cross-examination of Mr. Preston concerning his marital relations with Mrs. Preston and the fact that Mr. Preston lived with another woman in another state, rather than with plaintiff and Mrs. Preston. Defendants contend that inquiry into this matter was permissible and invited by Mr. Preston's testimony that he had the opportunity to observe plaintiff over the years, and a videotape and photographs of plaintiff accurately depicted plaintiff's disfigurement and disabilities, and Mr. Preston's intimations that he and Mrs. Preston enjoyed a traditional marital relationship.

Although the court may allow a broad scope for cross-examination, the scope cannot be so broad as to overcome the fundamental principle that only that which is relevant is admissible. *Glassman v. St. Joseph Hospital*, 259 Ill. App. 3d 730, 756 (1994). Here, Mr. and Mrs. Preston's marital relationship had no relevance to the issues in the case, and the trial court did not err in prohibiting this cross-examination. As the trial court succinctly noted, the case revolved around injury to a minor plaintiff, not the marital relations of her parents. Although defendants allege inquiry into these matters was invited by Mr. Preston's direct testimony, we find no indication of this under the record presented. Instead, it appears the trial court cautioned plaintiff's counsel that any testimony elicited on direct tending to misrepresent

Mr. Preston's marital relationship would open the door to further inquiry, and plaintiff's counsel confined his examination accordingly.

■ Defendants also contend that the trial court erred in allowing plaintiff's counsel to impeach Dr. Hughey with evidence that defense counsel's firm filed an appearance on his behalf in 1988 in the case Caftori v. Hughey. Defendants maintain that allowing the impeachment was improper because, among other things, the lawsuit was over 10 years old and neither Dr. Hughey nor defense counsel had any knowledge of a past attorney-client relationship between them.

The record indicates that although the trial court initially allowed impeachment on this matter, the court later concluded, at the posttrial hearing, that this determination was in error because the Caftori action was settled by Dr. Hughey's insurance company 10 years earlier and Dr. Hughey apparently had no knowledge of having been represented by defense counsel's firm. Under these circumstances, it is unnecessary to address defendants' argument in depth. We note only that we agree with the trial court's posttrial assessment that this evidence was too remote and attenuated to reliably serve as impeachment.

■ Finally, defendants contend that the trial court erred in allowing the jury to be instructed on damages for the loss of future earnings because the evidence was insufficient to support an instruction on this issue.

The question of what issues have been raised by the evidence is within the discretion of the trial court. *LaFever v. Kemlite Co.*, 185 Ill. 2d 380, 406 (1998). To be entitled to an instruction on future damages, a plaintiff need only cite to some evidence in the record to justify the theory of the instruction. *Mikus v. Norfolk & Western Ry. Co.*, 312 Ill. App. 3d 11, 33 (2000). However, where evidence is adduced of some permanent injury to a minor child, the trier of fact may infer a future loss of earnings from the nature of an injury, and an instruction to that effect may be issued. *Alvis v. Henderson Obstetrics, S.C.*, 227 Ill. App. 3d 1012, 1021 (1992), citing *Hartseil v. Calligan*, 40 Ill. App. 3d 1067, 1069 (1976).

Here, the uncontradicted testimony established that plaintiff's injury to her left arm was permanent. The testimony also set forth the range of plaintiff's functional impairment, including a permanent inability to fully extend, manipulate or bear weight with her left arm. On this record, we find the jury could properly infer a loss of future earnings from the nature of the injury, as revealed in the testimony. Accordingly, we find the giving of an instruction on the loss of future earnings was not error.

For the foregoing reasons, the trial court's judgment is reversed and this cause is remanded for a new trial.

Reversed and remanded.

McNULTY, P.J., and O'MARA FROSSARD, J., concur.